GREGORIA AGOSTO, demandante y apelante, *v.* RAÚL JAVIERRE, demandado y apelado.

Número 10706.

*Sometido:* 6 de noviembre de 1953. *Resuelto:* 30 de noviembre de 1954.

*José M. Valentín,* abogado de la apelante; *José J. Santiago,* abogado del apelado.

Opinión del Juez Presidente Sr. Snyder, en la cual concurren los Jueces Asociados Sres. Ortiz y Belaval

Estoy enteramente de acuerdo con la opinión del Juez Asociado Sr. Ortiz. Por los motivos expuestos en su opinión, estoy convencido de que el art. 116 del Código Civil fué enmendado implícitamente por la Ley núm. 229 de 1942 ((1) pág. 1297), según fué enmendada por la Ley núm. 243 de 1945 (pág. 815). Es cierto que en el caso de *Chabrán* v. *Méndez,* 74 D.P.R. 768, resolvimos que el art. 116 impedía un pleito de filiación instado por un menor bajo hechos sustancialmente similares a los aquí envueltos. Pero cometimos error en aquella parte del caso de *Chabrán* precisamente porque allí no consideramos el impacto de las leyes núms. 229 y 243 sobre el art. 116.

En contestación a la contención de que nos enfrascamos en legislación judicial en este caso, cito lo que dijimos en *Pérez* v. *Tribunal,* 69 D.P.R. 4, 19, escolio 5: " 'Legislación judicial' es una frase de variado alcance. Frecuentemente es un instrumento semántico empleado por aquéllos a quienes no les gusta el resultado obtenido por una corte enfrascada en la tarea de determinar el significado de una ley. Aquéllos que están conformes con el resultado la llaman 'interpretación judicial'." Añadimos en *Compañía Popular* v. *Unión de Empleados,* 69 D.P.R. 179, 190, escolio 2: "Por consiguiente, el calificativo parece que depende del resultado que uno prefiera. No vemos provecho alguno en aceptar uno u otro. Nos limitamos a la difícil tarea de tratar de determinar cuál fué la intención de la Legislatura."

Es eminentemente deseable la estabilidad del derecho. En verdad, cuando este Tribunal decide que debe revocar un caso anterior, debe revocarlo solamente con ca-

rácter prospectivo si están envueltos en él derechos contractuales o de propiedad. Véase mi opinión disidente en *Arvelo* v. *Rodríguez*, 69 D.P.R. 159, a la pág. 168. Pero nadie tiene un derecho adquirido en un error que este Tribunal haya cometido en un caso anterior de filiación. *Cf. Pérez* v. *Tribunal*, supra, 19. En este campo—quizás más que en ningún otro—debemos estar alertas no sólo para corregir nuestros errores sino también para aplicar las doctrinas corregidas a los casos pendientes.

■ Los derechos de los hijos nacidos antes del 25 de julio de 1952, se rigen exclusivamente por nuestros estatutos. Aquí otra vez, como en el caso de decisiones judiciales erróneas, ningún padre putativo tiene un derecho adquirido en estatutos injustos o ambiguos, aun cuando tales estatutos estuvieran vigentes a la fecha de la concepción o del nacimiento del hijo. El caso de autos, el de *Figueroa* v. *Díaz*, 75 D.P.R. 163, *Armaiz* v. *Santamaría*, 75 D.P.R. 579, y otros casos recientes, demuestran la necesidad de una revisión minuciosa por nuestra Asamblea Legislativa de las leyes de filiación aplicables a los hijos nacidos antes del 25 de julio de 1952. *Cf.* XXIII Revista Jurídica de la Universidad de Puerto Rico 258. Respetuosamente sugiero que la Asamblea Legislativa dé a este sentitivo asunto su atención en su próxima sesión.

---

Opinión del Juez Asociado Sr. Negrón Fernández concurriendo en el resultado

Los hijos naturales que en la década de 1942 a 1952 nacieron como fruto del adulterio de mujeres casadas, disfrutan hoy de un falso paraíso, construído sobre los escombros de su derecho en ruinas. Hoy ven abrirse las puertas de la impugnación de su propia legitimidad, tan sólo para tras de ellas encontrar cerradas, como consecuencia de la interpretación que antes hemos dado a la Ley 229 de 12 de mayo de 1942, las de la investigación de su verdadera paternidad. Por eso creo que este caso exige pronunciamientos de mayor

alcance jurídico que los que sirven de base a la opinión del Juez Asociado Sr. Ortiz y ofrece campo propicio para una legítima rectificación de la doctrina jurídica—imperante en una serie de decisiones nuestras—que somete el ejercicio de la acción filiatoria de todos los hijos naturales nacidos bajo la Ley 229 a los estrechos moldes del art. 125 del Código Civil.

Por necesaria coincidencia, la opinión del Juez Ortiz tiene por base esencial, en el restringido ámbito del derecho a la impugnación de la legitimidad, la misma tesis jurídica que, en el más amplio ámbito del derecho intrínseco a la filiación, ha sido rechazada por el Tribunal: la modificación de preceptos, otrora infranqueables del Código Civil, por las disposiciones de la Ley 229. Es un laudable, pero tardío e incompleto esfuerzo por dar plenitud de expresión al evidente propósito de justicia social que tuvo la legislación de referencia. Dicha teoría jurídica—al sostener que por impacto de la Ley 229 ha quedado modificado el art. 116 del Código Civil—reconoce, en esencia pero sin darle virtualidad, la tesis básica, sostenida por mí y derrotada antes en *Figueroa* v. *Díaz*, 75 D.P.R. 163, opinión propia; *Armaiz* v. *Santamaría*, 75 D.P.R. 579, opinión disidente propia, y *Vargas* v. *Jusino*, 71 D.P.R. 389, opinión disidente propia a la pág. 396, en el sentido de que la acción filiatoria bajo la Ley 229 requiere tan sólo prueba de la paternidad, y no está limitada a las disposiciones restrictivas del art. 125 de dicho Código. La falla, a mi juicio, de nuestra jurisprudencia en contrario, es la de haber atribuído a la reforma legislativa de 1942—época en la que el mundo libre ya avanza hacia el pleno reconocimiento de los valores del hombre—el mismo patrón de estoica insensibilidad humana que caracterizaba el derecho de los hijos ilegítimos hace tres cuartos de siglo.

La utilidad práctica de la doctrina jurídica que permite a un hijo natural—nacido de relaciones ilícitas de mujer casada durante la vigencia de la Ley 229—instar una acción filiatoria contra su verdadero padre a pesar del *status* de hijo

legítimo que le otorga el Código Civil, se diluye en un mundo de ilusiones cuando se somete dicha acción a los requisitos probatorios del art. 125 del Código Civil. Dentro de este molde no tendrá, en verdad, ese hijo natural—al sostener que él no es hijo de quien se reputa como padre legítimo y sí de un tercero que resulta natural bajo la Ley 229—"una oportunidad judicial para que compruebe esa alegación" si esa "oportunidad judicial", por lo inútil, se convierte, de hecho, en una total, o casi total, negación de oportunidades reales para obtener el derecho que se reclama—la naturalidad del padre que se busca—*Figueroa* v. *Díaz*, opinión propia, supra, negación que engendra a su vez el potencial riesgo de perder el derecho que se disfruta—la legitimidad del padre que se impugna.

Las trabas que el legislador quiso deshacer con la aprobación de la Ley 229 no deben producir más frustraciones de derechos filiatorios, ni por efectos del art. 116 del Código Civil en cuanto a hijos nacidos del adulterio de mujeres casadas, ni por efectos del art. 125 en cuanto a esos y todos los demás hijos naturales nacidos bajo la vigencia de dicha ley. El propósito reparador de esa pieza legislativa requiere que sus disposiciones se apliquen teniendo como fondo el realismo intrínseco del derecho, y así, por virtud de la inherente verdad que encierran, presenciar, en plena comunión de sus valores mutuos, "el triunfo del sentido humano de la ley"[1] y la eminente función social de la justicia.

Por eso al concurrir con la revocación de la sentencia apelada y expresar mi conformidad con la doctrina por la que se reconoce en la opinión del Juez Asociado Sr. Ortiz el derecho del menor demandante a instar la acción filiatoria para buscar a su verdadero padre, no obstante el *status* de legítimo de que bajo el Código Civil—todo en virtud y por efectos de la Ley 229—hago reserva en cuanto a algunos extremos que considero innecesariamente discutidos en dicha opinión, y expreso mi inconformidad en cuanto a otros, especialmente en

---

[1] Frase del Juez don Jacinto Texidor y Alcalá del Olmo en *Stella Vda. de Ortiz* v. *Corte*, 41 D.P.R. 641, 643.

cuanto a la necesidad de enmendar la demanda, pues en mi concepto y de acuerdo con el criterio expresado por mí en *Figueroa* v. *Díaz*, supra, la misma expone una causa de acción filiatoria que no requiere enmienda.

### Opinión del Juez Asociado Sr. Ortiz

Gregoria Agosto, en representación de su hijo Raúl Agosto, nacido el 13 de mayo de 1950, [1] presentó, en la Sección de San Juan del anterior Tribunal de Distrito de Puerto Rico, una demanda contra Raúl Javierre, en reclamación de alimentos para su hijo. Después de haberse celebrado la vista del caso en sus méritos, el Tribunal de San Juan dictó sentencia declarando sin lugar la demanda, en vista de que, a la fecha de la concepción del niño y a la fecha del juicio, la demandante era casada con Rodolfo Rodríguez Meléndez, debiéndose presumir que el menor era hijo legítimo de dicho Rodolfo Rodríguez Meléndez; que, envolviendo la reclamación de alimentos una alegación de que el padre del menor era el demandado, y no el esposo de la demandante, tal reclamación conlleva una impugnación de la legitimidad del menor y que tal legitimidad puede ser impugnada por el esposo solamente, y no por la madre ni por el menor, en vista de lo dispuesto en los arts. 113 y 116 de nuestro Código Civil y de lo resuelto por este Tribunal en los casos de *Pueblo* v. *Santiago*, 70 D.P.R. 837 y *Pérez* v. *Rosario*, 72 D.P.R. 514. La demandante ha apelado ante este Tribunal, y solicita de nosotros que revoquemos los casos citados.

 El art. 113 del Código Civil dispone lo siguiente:

"Son hijos legítimos los nacidos después de los ciento ochenta días siguientes al de la celebración del matrimonio y antes de los trescientos días siguientes a su disolución.

---

[1] En la demanda no se usan expresamente las palabras, anteriormente sacramentales, de que la madre comparece "en representación de su hijo". Tal expresión es innecesaria, si de la demanda surge que realmente la acción es en beneficio del hijo y se ha entablado en su representación. *Maldonado* v. *Quetell*, 68 D.P.R. 420. La realidad prevalece sobre el formulismo de las palabras exactas.

"Contra esta legitimidad no se admitirá otra prueba que la imposibilidad física del marido para tener acceso con su mujer en los primeros ciento veinte días de los trescientos que hubiesen precedido al nacimiento del hijo."

El art. 116 del mismo cuerpo legal lee de la siguiente manera:

"La legitimidad puede ser impugnada *solamente por el marido o sus legítimos herederos.* Estos sólo podrán impugnar la legitimidad del hijo en los casos siguientes:

"1.—Si el marido hubiese fallecido antes de transcurrir el plazo señalado para deducir su acción en juicio.

"2.—Si muriese después de presentada la demanda sin haber desistido de ella.

"3.—Si el hijo nació después de la muerte del marido." (Bastardillas nuestras.)

En el caso de *Pueblo* v. *Santiago*, supra, se resolvió lo siguiente:

"Al prescribir en el artículo 116 del Código Civil que la legitimidad de los hijos puede ser impugnada solamente por el marido y sus legítimos herederos, con ello el legislador excluyó a toda otra persona o entidad no mencionada en dicho artículo inclusive al Estado mismo. Declarada por éste en dicho Código su política pública en relación con esa impugnación, no debe variar con la clase de procedimiento—civil o criminal—que se establezca en el cual la impugnación se haga."

En el caso de *Pérez* v. *Rosario*, supra, este Tribunal resolvió lo siguiente:

"La mujer casada no puede impugnar la legitimidad de su propio hijo aun aceptando, sin resolverlo, que su declaración en cuanto a la imposibilidad física del marido para tener acceso con ella dentro de los 120 días de los 300 que hubiesen precedido al nacimiento del hijo fuere suficiente en un caso sobre impugnación de legitimidad como prueba contra esa legitimidad.

"Una hija nacida durante el matrimonio después de los 120 días siguientes al de la celebración del mismo, tiene la presunción de ser legítima, no pudiendo la madre por sí destruir esa presunción para convertir dicha hija en natural a virtud de la Ley núm. 229 de 1942 ((1) pág. 1296), según fué enmendada por la núm. 243 de 1945 (pág. 815)."

En la opinión se dijo lo siguiente, a la pág. 516:

"Arguye, además, la apelante que ella declaró que su esposo se había ido para Saint Thomas y que, por tanto, demostró la imposibilidad física de haber tenido acceso con ella. Aceptando, sin resolverlo, que esa declaración fuera suficiente en un caso sobre impugnación de legitimidad—Cf. *Cubano* v. *Del Valle*, 69 D.P.R. 579—siempre tendríamos el hecho de que el artículo 116 del Código Civil, supra, no autoriza a la esposa a impugnar la legitimidad de su hijo."

Un nuevo examen de la doctrina sentada en los casos citados nos ha convencido de que esos casos deben ser revocados, especialmente en vista de la disposiciones, del espíritu y de la nueva tónica de nuestra legislación reciente en cuanto a los derechos de los hijos conocidos anteriormente por "adulterinos".

Consideremos en primer término la situación prevaleciente en España, en cuyo Código Civil se originaron los conceptos incorporados a los arts. 113 y 116 del Código nuestro. El art. 108 del Código básico de España corresponde sustancialmente al 113 nuestro. De los arts. 111, 112 y 113 de España se desprende que el esposo o sus herederos, en su caso, podrán impugnar la legitimidad del menor nacido dentro del matrimonio. Pero aun bajo esas disposiciones, el Tribunal Supremo de España resolvió, en sentencia dictada el 20 de marzo de 1919 (145 Jurisprudencia Civil 562), que el propio hijo cuya legitimidad esté en controversia, puede entablar una acción para rechazar su legitimidad y anular el acta correspondiente de legitimidad inscrita en el Registro Civil. En la opinión se dice lo siguiente:

"Considerando que lo mismo en el matrimonio canónico que en el civil là legitimidad de los hijos procreados durante ellos produce los efectos trascendentales que previsoramente estatuye nuestro derecho positivo, pero no cuando la filiación directa, en vez de lícita y verídica, se informa en actos de falsedad y de ficción que, contraviniendo gravemente la ley y la moral, conducen a que. pasen por descendientes los que en la vida civil y jurídica no merecen esa consideración:

"Considerando fijada la tesis general que al hijo cuya filiación, ajena por supuesto a su voluntad, aparece inscrita en el Registro civil atribuyéndole una paternidad que naturalmente no le corresponde, debe, si no ha de quedar indefenso, dejársele en libertad de rechazar un supuesto nacimiento que, aunque consignado en acta, no tiene más que un carácter provisional o valor de presunción destructible en juicio contradictorio por otros elementos de prueba:

"Considerando que vale poco, por ser infundado, el argumento de que no cabe impugnar el acta de nacimiento ante la falta en nuestro Código de disposición alguna que autorice la impugnación, porque esta clase de documentos, cuando su contenido se contradice, no hacen fe más que de la fecha o día de la inscripción, nunca según la jurisprudencia imperante de las manifestaciones que respecto del parentesco en ellos se inserten; de modo que el silencio de la ley, aunque se diera, no basta para formar un criterio tan severo que en muchos casos contribuiría a que se echase de menos la base de un estado personal cierto de filiación, se desharía con la confusión de la prole la consistencia e indisolubilidad del matrimonio, y como consecuencia a la vez que el sentimiento de la paternidad las relaciones afectivas entre padres e hijos, con detrimento también de la conciencia pública personificada en el Estado llamado a intervenir en la organización de las familias para que sin artificios se perpetúe en su seno la identificación natural y legítima de la prole:

"Considerando que examinada ya la falta de derecho por las reglas de una interpretación lógica y equitativa, prerrogativa de los Tribunales para suplir omisiones y parquedades legislativas, no es violento afirmar que idéntica atribución concede el Código a la demandante para combatir la eficacia de un título aparente de filiación que su propia naturaleza rechaza, pues al decir en su art. 118 que asiste al hijo durante toda su vida, *acción para reclamar* en estado cierto de legitimidad, este mismo concepto gramatical determinando en locución genérica, comprende a *sensu contrario* la facultad *de impugnar* por la razón de que en su espíritu, tanto vale demandar una cosa justa como contradecir la que se tenga por injusta:

"Considerando que otro tanto ocurre con lo que dispone el art. 137 del propio Cuerpo legal, en relación con el 135, los cuales preceptos, muerto el padre, conceden al hijo natural, como medio de protección, acción y derecho para reclamar su reconocimiento

antes de que transcurran los primeros cuatro años de su mayor edad:

"Considerando que al éxito de la casación tampoco mejora porque se alegue en los recursos la incompatibilidad de reclamar e impugnar a la vez dos estados posesorios como el de reconocimiento de hija natural, y el de la legitimidad que ofrece el acta de nacimiento, como si no obstante representar este último documento un hecho que se estima falso, no pudieran cambiarse en discusión judicial los efectos jurídico-personales de una filiación artificiosa que conduciría a echar por tierra todo el sistema de los descendientes nacidos fuera del matrimonio o que carecen de estado personal:

"Considerando que por intentar la parte actora obtener su reconocimiento por la posesión continua de estado de hija natural, no investiga la paternidad una vez que a éstos descendientes de segunda categoría se les permite probar aquella cualidad sobre la verdad y certeza de la procreación natural:

"Considerando que no obstante la influencia que en el debate pudieran ejercer los razonamientos anteriores nada se resolvería con esto si los hechos discutidos dejasen de estar comprobados, y de ahí la necesidad de trasladar casi literalmente la apreciación de la Sala, en la cual, contra lo que expresa la certificación del Registro civil, desmentida por el supuesto padre, se declara que el nacimiento de Francisca Juana tuvo lugar en el domicilio de Murillo; que la dió a luz Presentación Rodríguez, no María de los Ángeles; y que a expensas del padre con quien durante sus días vivió fué criada y la tuvo por hija al extremo de permitirla que usase públicamente su apellido:

"Considerando que estas apreciaciones de la Sala, único juez de la controversia de hecho servirían también muy poco a los efectos de la casación si aquí se dieran las excepciones de prescripción en que los recurrentes se apoyan, inadmisibles las dos; la especial del art. 113, porque siendo como es únicamente aprovechable contra el marido y sus herederos, carece aquí de aplicación; y la del 1964, que es de carácter general y afecta a las acciones personales, porque según tiene dicho este Supremo Tribunal, sobre todo en su sentencia de 22 de octubre último, el punto de partida de la prescripción ha de contarse desde la muerte de Murillo, que fué cuando dejó de sentirse el firme propósito que venía ostentando de otorgar a su hija menor la posesión constante de estado civil, justificada por actos directos y sucesivos de

reconocimiento que desmienten la voluntad de excluirla de la familia. materna:

"Considerando, en fin, que si, por todo lo expuesto, no es concebible que la demandante carezca de acción para combatir una fiiliación distinta a la del reconocimiento natural que, aunque inferior a la legítima, dice mejor la verdad, según estima el Tribunal sentenciador, y si tampoco hay fundamento para dar por vencida la causa de la actora por haber prescrito su derecho, es manifiesto que no pueden prosperar en toda su integridad los dos recursos interpuestos contra la sentencia de la Sala;"

Esta última opinión ha sido caracterizada como introductoria de una "norma nueva, terminante y justa, supletoria del Derecho legal vigente". Revista de Derecho Privado, Tomo 6, págs. 233, 234. Coincidimos con el criterio sentado por el más alto Tribunal de España, al abrir las puertas judiciales a una reclamación instada por el hijo en discusión, a los fines de establecer la realidad de su filiación.

Debemos aclarar que los hechos envueltos en la opinión que hemos citado no son exactamente iguales a los del caso de autos. En el caso de España la niña fué inscrita como hija legítima de los esposos Roque Castellano Molero y María de los Ángeles Rodríguez Durán, y realmente ella alegaba que no era hija de ninguno de esos dos cónyuges, sino que alegaba ser hija de otras dos personas, de Francisco Murillo Delgado, viudo, y Presentación Rodríguez Durán. Por lo tanto, no era hija de una mujer casada, como ocurre en el caso de autos. Pero existen, por lo menos, dos circunstancias que hacen aplicable, por analogía, el caso de España al de autos. Esto es, en la opinión se expresa que el artículo del Código Civil de España que señala un período de prescripción con respecto a la acción de impugnación de legitimidad "es únicamente aprovechable contra el marido y sus herederos", esto es, que no era aplicable al caso en que una persona distinta al marido o sus herederos instaba una acción para establecer la realidad de la filiación, siendo procedente tal acción aun si ella envolvía una impugnación a la legitimidad. De todos modos, la niña en cuestión tenía un *status* oficial de hija legítima, y

la acción instada envolvía necesariamente una impugnación a su legitimidad, y ello se consideró como permisible por el Tribunal Supremo de España. Una segunda circunstancia de gran significación, que convierte el caso de España en aplicable al de autos, se refiere al hecho de que la niña del caso español era una hija natural, ya que no era hija de ninguno de los cónyuges que la inscribieron como su hija legítima, y sus verdaderos padres podían casarse entre sí al tiempo de la concepción de la niña. El Tribunal Supremo de España señaló el hecho de que, como tal hija natural, ella tenía derecho a instar una acción de filiación, debiendo ser protegido el ejercicio de ese derecho aunque ello envolviese una impugnación a la legitimidad. En cuanto al caso que ahora nos ocupa, el niño es considerado por la ley como un hijo natural, y no como un hijo adulterino, con derecho a entablar una acción de filiación como hijo natural, en virtud de las disposiciones de la Ley núm. 229 de 12 de mayo de 1942, según fué enmendada por la Ley núm. 243 del año 1945, y de la Ley núm. 448 de 1947 ((1) pág. 947), aplicables a este caso por haber nacido el niño en el 1950. Nos encontramos, por lo tanto, con ese elemento de coincidencia con la sentencia citada de España, en cuanto al *status* de hijo natural, indicándose en tal sentencia que el artículo que le concede al marido o a sus herederos el derecho a impugnar la legitimidad no excluye la acción de filiación de un hijo natural, aun si tal acción envuelve una impugnación a la legitimidad.

Ahora bien, se hace preciso el señalar una diferencia entre el art. 116 de nuestro Código Civil y los artículos correspondientes del de España, 112 y 113, que están redactados en términos de permitir al marido o a sus herederos el incoar la acción de impugnación, pero no en forma exclusiva, mientras que el art. 116 del nuestro dispone que la legitimidad puede ser impugnada *solamente* por el marido o sus herederos. (El término "solamente" no está incluído en el articulado español.) Sin embargo, la aparente exclusividad contenida en el art. 116 perdió su eficacia y virtualidad jurídica,

su efectividad concreta y su razón de ser, y fué modificada, y eliminada como tal exclusividad, por la Ley núm. 229 de 12 de mayo de 1942, en cuanto a los hijos "adulterinos" nacidos después de esa fecha. La citada Ley núm. 229 de 1942 dispone, en parte, lo siguiente:

"Sección 1.—Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta Ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

". . . . . . . .

"Sección 3.—En ninguna acción criminal o civil contra el padre o la madre que hubiese reconocido a un hijo que no tenía la condición de hijo natural según la legislación anterior, podrá presentarse como evidencia el hecho de tal reconocimiento, a menos que se trate de una acción incoada por el hijo en reclamación de su derecho como tal."

En virtud de las disposiciones de esa ley, los hijos anteriormente conocidos como "adulterinos", esto es, uno de cuyos padres estaba casado con otra persona, en cuya categoría se alega que está el menor envuelto en este caso, de nacer después de la vigencia de esa ley, deben ser considerados como hijos naturales, con todos los derechos correspondientes. Un hijo anteriormente conocido como "adulterino" nacido con posterioridad a la vigencia de la ley citada, tiene desde el momento de su nacimiento la condición de hijo natural *a todos los efectos legales*, independientemente de que sus padres hubieran podido, o no, contraer matrimonio al tiempo de su concepción. *Cruz* v. *Andrini*, 66 D.P.R. 124, 128; *Montañez* v. *Rodríguez*, 67 D.P.R. 214; *Falcón* v. *Cruz*, 67 D.P.R. 530, 532; *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987. Uno de los efectos legales de la condición de hijo natural, y uno de los derechos correspondientes a tal hijo natural, es el derecho a entablar una acción de filiación. Un hijo de una mujer casada, nacido con posterioridad al 12 de mayo de 1942, que alegue que es hijo natural de un hombre distinto al esposo de la

madre, puede entablar una acción de filiación contra su verdadero padre. El establecimiento del *status* de hijo natural del demandado conlleva necesariamente la conclusión de que el demandante no es hijo legítimo del esposo de la madre del demandante. La impugnación de la legitimidad está implícita en la acción filiatoria, esto es, el ataque a la legitimidad es un ingrediente esencial de la acción de filiación. Al borrar el "estigma" de hijo adulterino, y al convertir tal hijo en natural, la ley 229 de 1942 concede el derecho a entablar una acción de filiación, lo que envuelve necesariamente la concesión del derecho a impugnar la legitimidad. La ley 229 crea una nueva causa de acción, que no existía anteriormente. La creación de esa nueva causa de acción (de filiación y, en su consecuencia, de impugnación de la legitimidad), es secuela de la nueva condición de hijo natural reconocida por la ley 229. Antes de la vigencia de esa ley, había margen para resolver que un hijo adulterino no podía instar una acción de filiación. *Cortés* v. *Sucn. Solá*, 72 D.P.R. 627, 630. Bajo esa situación legislativa anterior, tenía eficacia y virtualidad la disposición del art. 116 del Código Civil al efecto de que la legitimidad podía ser impugnada *solamente* por el marido o sus herederos. El hijo adulterino no podía impugnar la legitimidad especialmente en vista de que él no podía entablar una acción de filiación en la cual se pudiese dilucidar la legitimidad, o la ausencia de legitimidad. Pero la ley 229 de 1942 conlleva el pronunciamiento de que el hijo natural puede también impugnar su propia legitimidad como un incidente de la acción de filiación que se le concede bajo tal ley. Ya no son solamente el marido o sus herederos los que pueden impugnar la legitimidad del menor, sino que también el propio menor puede formular tal impugnación, para que pueda tener significación y eficacia la acción de filiación reconocida por la ley 229. Por lo tanto, la restricción de exclusividad contenida en el art. 116 no es aplicable a los hijos nacidos con posterioridad a la ley 229 de 1942. La continuación de tal exclusividad sería incompatible con la acción de filiación con-

cedida a tales hijos por la ley 229. El término "solamente el marido o sus herederos" ha quedado implícita, pero necesariamente, modificado por la ley 229. El art. 116 del Código Civil es una disposición general que era congruente con el trato general que se le daba a los hijos naturales en el Código Civil, antes del 1942. La ley 229 es una ley especial que debe prevalecer sobre la generalidad del art. 116, de acuerdo con los principios usuales de la hermenéutica legal. La ley 229 crea un nuevo trato especial que se le da a los hijos anteriormente conocidos por "adulterinos", que conlleva una transformación en el anterior sistema general. Las nuevas categorías especiales conllevan la inaplicabilidad de los viejos conceptos, que respondían a una situación distinta a la que surgió a la vida jurídica bajo la ley 229.

Desde otro punto de vista, la legislación moderna le ha concedido derechos valiosos a los hijos conocidos anteriormente como adulterinos, que hayan nacido después del 12 de mayo de 1942. Entre esos nuevos atributos está la igualdad con los hijos legítimos en cuanto a derechos hereditarios, bajo las disposiciones de la ley 448 de 1947. *Cortés* v. *Cortés*, 73 D.P.R. 693. Para que ellos tengan la oportunidad de imprimirle efectividad a esos derechos, a ellos se les debe reconocer la aptitud de tener a su alcance los remedios judiciales correspondientes. Donde existe una causa de acción debe existir un remedio. *García* v. *García*, 18 D.P.R. 963, en donde se aplicó tal máxima en beneficio de un niño que solicitaba que se anulase la inscripción de su nacimiento como hijo natural. No deben cerrarse absolutamente las puertas judiciales para negar acceso a los tribunales a aquéllos que aleguen disfrutar de derechos sustantivos creados por ley. La nueva condición de hijos naturales de los hijos "adulterinos", al crear nuevos derechos, debe conllevar la apertura de puertas judiciales y el reconocimiento de nuevas oportunidades en los tribunales para establecer tal condición, aunque ello envuelva la impugnación de la legitimidad. La ley 229 de 1942 ensancha los caminos que llegan a la verdad, y abre las puertas que estaban

tapiadas por el art. 116. Bajo el art. 116 el esposo o sus herederos eran los únicos árbitros de la conveniencia de investigar la realidad filiatoria. Debe concederse al hijo, personaje central en el drama, la misma oportunidad para lograr acceso al escenario judicial, donde ha de ventilarse su propia condición y su estado auténtico.

Desde el punto de vista de la lógica jurídica y de los postulados de interpretación estatutaria, es inescapable la conclusión de que la ley 229 de 1942, al conceder una acción filiatoria a los hijos "adulterinos", conlleva una modificación del sistema estricto de exclusividad encarnado en el art. 116. Consideremos ahora el problema desde el punto de vista histórico y social. No podemos decir que el concepto "solamente" (el marido o sus herederos), utilizado en nuestro art. 116 sea un reflejo del Código Civil de España. Como ya hemos indicado, los artículos 112 y 113 del Código Civil de España, que cubren el mismo campo del 116 nuestro, disponen esencialmente que el marido o sus herederos podrán instar una acción de impugnación de legitimidad dentro de cierto período prescriptivo, esto es, a ellos se les concede la oportunidad de impugnar la legitimidad, pero los artículos citados de España no utilizan el término "solamente". Es en Louisiana y en California donde ha prevalecido el concepto de "solamente el marido o sus herederos". *State* v. *Jones*, 1951, 56 So.2d 724; *State* v. *Randall*, 53 So.2d 689; *Jenkins* v. *Aetna Casualty Co.*, 158 So. 217; 5 *Tulane L. Rev.* 449; *In re Madalina*, 174 Cal. 693, 164 P. 348, 1 A.L.R. 1629; *Estate of Lee*, 200 Cal. 310, 253 P. 145; *Serway* v. *Galentine*, 170 P.2d 32; *González* v. *Pacific Greyhound Lines*, 1949 y 1950, 202 P.2d 135, 209 P.2d 598, 214 P.2d 809; 23 So. Calif. L. Rev. 538, 561, et seq. Aparentemente, la regla de Louisiana y de California se basó en el Código Napoleónico. No podemos olvidar que, en lo que se refiere a hijos ilegítimos, el Código Napoleónico era excesivamente restrictivo al prohibir absolutamente la investigación de la paternidad de hijos ilegítimos,

por lo que ha sido criticado severamente, siendo finalmente enmendado el art. 340 del Código Civil de Francia en el año 1912, permitiéndose entonces la investigación de la paternidad en cierto número de situaciones específicas. 1 Manresa 630, 631 et seq., 6ta. ed.; Colin y Capitant, Derecho Civil, Tomo 1, pág. 621, 623 (2da. ed. pág. 602). Lo importante es notar que nuestro art. 116, interpretado literalmente, es más riguroso, en cuanto a la acción "En Deseaveneu" (para impugnar la legitimidad, 23 So. Calif. L. Rev. 563), que las disposiciones correspondientes de España. Hemos seguido el modelo de Francia, Louisiana y California, más allá de las pautas españolas. Incidentalmente, aunque el derecho romano observaba normas estrictas contra los hijos ilegítimos, (23 So. Calif. L. Rev. 544; 30 Col. L. Rev. 308, 310), el antiguo derecho canónico o eclesiástico era muy liberal en cuanto a permitir a los hijos ilegítimos el establecer su estado, desde el punto de vista de la igualdad esencial de los hombres, en su origen. 23 So. Calif. L. Rev. 546; Sentencia del Tribunal Supremo de España del 5 de julio de 1944, citada en Rodríguez Navarro, Doctrina Civil del Tribunal Supremo, pág. 672. Bajo el derecho común, aunque a partir del siglo 18 la madre no podía declarar contra la legitimidad de sus hijos, bajo la regla de Lord Mansfield (7 Wigmore 358, 360, sec. 2063, 3ª ed., en que se critica tal regla en forma despiadada y terminante), sin embargo, el derecho común siempre permitió a los hijos ilegítimos el instar la acción de impugnación de legitimidad. 23 So. Calif. L. Rev. 562, 563; *Wright* v. *Hicks*, 56 Am. Dec. 451; 7 Am. Jur. 638. Los casos y autoridades que hemos citado de Louisiana y California se basan en disposiciones estatutarias análogas al 116 nuestro, pero en ninguna de esas jurisdicciones se ha aprobado legislación como nuestra Ley 229 de 1942, la cual cambia totalmente la situación.

Los argumentos que se han levantado para justificar la tesis de que solamente el marido o sus herederos podrán impugnar la legitimidad de un hijo, y de que el hijo en sí no

puede instar la acción de impugnación, pueden resumirse en la siguiente forma:

(1) El permitir a personas que no sean el marido o sus herederos el atacar la legitimidad lesionaría o pondría en peligro la integridad y santidad del matrimonio.

(2) No se debe permitir que el hijo sea su propio instrumento de destrucción, o sea, que él mismo destruya su *status* de legitimidad, ni se debe permitir que la madre, por impulsos pasionales del momento, o como resultado de la posible coacción de su marido, pretenda atacar la legitimidad de su prole.

(3) El marido debe ser el único árbitro de su honor ofendido.

(4) Los herederos del marido pueden tener la oportunidad de invocar la ayuda judicial para decretar la ilegitimidad del hijo en cuestión, a los fines de proteger los derechos hereditarios de esos reclamantes.

(5) El extender la autorización para entablar la acción ("En Desavenue") a otros que no sean el marido o sus herederos abriría las puertas al escándalo y a la inmoralidad.

La exposición en sí de los argumentos aducidos basta para demostrar su falta de solidez. El tema esencial, el motivo latente y continuo, se refiere al estigma y a la mancha social que se pretende adherir a los hijos "adulterinos". Comentando los arts. 139 y 140 del Código Civil de España, que corresponden a los 128 y 129 nuestros, y que disponen que el único derecho de los hijos adulterinos era a alimentos, siempre y cuando que su *status* como tal surgiese de una sentencia firme, se indica lo siguiente en 3 Scaevola 429, 5ta. edición:

"El espíritu restrictivo que informa a las legislaciones de todos los países en lo referente a los hijos ilegítimos, se ofrece en su más alto grado cuando se trata de los propiamente tales, esto es, de los no naturales, verdaderos parias del orden social. Y en verdad que éste es el calificativo más acertado que puede dárseles. La consideración que ante la ley y la sociedad tienen

hoy las distintas clases de hijos, guardan exacta proporción con las que gozaban las diversas castas en la India. Así como la de los brahmanes o sacerdotes era la más noble y digna, pues, como decía el Código de Manú, 'entre los seres inteligentes son primero los hombres y entre éstos los brahmanes', así los hijos legítimos ocupan el primer lugar en la escala legal de la filiación. Vienen después los legitimados y a seguida los naturales, que bien pueden equipararse a los chatrias en cuanto al orden de preferencia, desde el punto de vista antes indicado, y, por último, los demás ilegítimos, que, a semejanza de los sudras, representan una clase social abyecta, mirada con desprecio por las demás y desprovista casi en absoluto de derechos.

"Refléjanse en especial estas circunstancias en el extremo de la investigación de la paternidad o maternidad de tales hijos, que rechazan en términos crueles, y hasta ofensivos para la dignidad de éstos, los que tampoco la admiten con relación a los naturales. 'El reconocimiento de los hijos adulterinos o incestuosos—manifiesta Bigot–Préameneu—supone, de parte del padre o de la madre, la confesión de un delito', y Lahary pregunta: ¿Hay algo más inmoral que asegurar la protección de la ley a un hijo monstruoso, que por algunos alimentos que puede obtener acusaría a los autores de sus días de haberle dado nacimiento por un delito, por un crimen? Este es el capital argumento (ésta y no otra palabra es la que merece) expuesto contra la investigación, y el que determinó su prohibición en el Código Francés (arts. 335 y 342), que, en nuestro sentir, no basta para justificarla.

"Cierto es que la investigación presupone como base la denuncia de un hecho punible; pero ¿han olvidado los enemigos de aquélla que es de interés social el descubrimiento y castigo de todo delito? Fundándose en este mismo interés, ¿no admiten las legislaciones de los pueblos cultos el carácter de pública y popular para la acción penal? ¿No dice esto el art. 101 de nuestra ley de Enjuiciamiento Criminal, confirmándolo el 270 de la misma al declarar que pueden querellarse todos los ciudadanos españoles, hayan sido o no ofendidos por el delito? Pues si cualquier persona en la plenitud de los derechos civiles puede poner de manifiesto la existencia de un delito, ¿por qué prohibírsele al hijo cuando hace la denuncia, no con el fin único y directo del castigo del hecho penable, sino como medio necesario e indispensable para lograr la condición civil que le corresponde? Es verdad que el art. 261 de la citada ley de Enjuiciamiento criminal

exime al hijo de la obligación de denunciar, pero la denuncia a que se refiere la ley tiene un objeto exclusivamente penal, la. acusación de un delito, y en la investigación no sucede así. Además, hay casos en que no hace falta denunciar, ni menos probar el delito, porque éste se halla ya demostrado, por ejemplo, en los de estupro, rapto o violación, o ejecutados por varón casado o ligado con orden sagrada, de manera que en ellos no tiene aplicación el argumento de Bigot-Préameneu y Lahary. Nuestro Código Civil, compenetrándose de la justicia y evidencia de este último razonamiento, concede al hijo ilegítimo (caso 2º del art. 140) el derecho de alimentos cuando la paternidad o maternidad se infiera de un proceso criminal.

"Pero lo que no puede tolerarse en modo alguno son las palabras de Lahary calificando de monstruoso al hijo ilegítimo (adulterino o incestuoso). ¿Quién ha pensado jamás llamar criminal al hijo, inocente del delito que haya podido cometer un padre o una madre? ¿Desde cuándo y en virtud de qué principio una persona ha de sufrir las consecuencias, si no materiales, morales por lo menos, del crimen cometido por otra? ¿Quién es aquí el monstruo, el hijo que ha venido al mundo de una manera arbitraria y sin su consentimiento, como dice Kant al explicar el fundamento del derecho a alimentos, o el padre y la madre que le han dado el ser impulsados por un amor sacrílego o criminal? ¿Merece tales calificativos el hijo que se ve abandonado por sus padres, privado de esos alimentos de que tan desdeñosamente habla Lahary, y que son indispensables para la vida física e intelectual de todo hombre?"

Más adelante, se dice en Scaevola, a la pág. 434, lo siguiente:

"Omite el Código un caso que menciona respecto a los hijos naturales; el de la posesión continua de estado de hijo ilegítimo, que, aunque parezca lo contrario, existe, y que en nuestro sentir ha debido aquél comprender. Es el caso frecuente, frecuentísimo por desgracia en nuestra sociedad, de una esposa o un marido separados, ya por divorcio, ya de una manera convencional o amistosamente, que hacen vida marital con su amante y de cuyas relaciones nacen hijos que viven con sus padres y son por ellos alimentados y educados. Estos hijos, que gozan de la posesión constante de la filiación ilegítima con relación a sus

progenitores, cuya paternidad y maternidad se demuestran por los actos de éstos, ¿por qué no han de gozar del derecho consignado en el art. 139?"

Nuestra legislación moderna ha eliminado el estigma y ha borrado la mancha que se adhería a los hijos adulterinos, al colocar a los hijos adulterinos en igualdad de derechos con los hijos naturales y los hijos legítimos. Por lo tanto, ha desaparecido la razón de ser de los argumentos que sostienen el postulado de que solamente el marido o sus herederos podrían impugnar la legitimidad. Refiriéndose a los argumentos específicos que ya hemos señalado, de ser ciertas las alegaciones del menor reclamante, la integridad del matrimonio ya ha quedado lesionada, como cuestión de hecho, por el adulterio en sí. El adulterio debe ser penalizado en la forma que sea procedente, a los fines de proteger el matrimonio. Pero, como indicaba el antiguo derecho canónico, que siempre se mantenía en vanguardia propulsando el enaltecimiento y amparo del matrimonio, la teoría de la culpa no debe ser desviada para llevar a descargar únicamente en los hijos las consecuencias de los actos ilícitos de sus padres. Sentencia del Tribunal Supremo de España del 5 de julio de 1944, citada en Rodríguez Navarro, pág. 672. Lo importante es establecer la realidad de los hechos que rodean a la filiación auténtica, y no debe mantenerse una paternidad o filiación espuria o falsa a base de mantener la integridad artificial de un matrimonio. De otro lado, la tesis de que los hijos no deben ser instrumentos de su propia destrucción supone el postulado, eliminado por nuestra legislación moderna, de que el ser un hijo ilegítimo constituye, de por sí, una destrucción de la personalidad. Es irrazonable la tesis de que el marido debe ser el único árbitro en cuanto al momento que sea adecuado para proteger su "honor". Sin negar su posible virtualidad individual, el concepto del honor, en casos como el de autos, no debe servir de impedimento a la investigación judicial de la realidad de los hechos. El poder de decisión en cuanto a si un tribunal debe o no debe dilucidar la filiación o paternidad

no debe descansar exclusivamente en el marido o sus herederos. En cuanto a estos últimos, no puede justificarse su iniciativa exclusiva para instar la acción, a los fines de proteger sus derechos hereditarios, ya que, bajo las leyes aprobadas en el año 1942 y en años posteriores, los derechos hereditarios de los hijos ilegítimos son iguales a los disfrutados por los hijos legítimos. De todos modos, los derechos propietarios no deben servir para excluir absolutamente los derechos humanos. En cuanto al supuesto escándalo o inmoralidad envuelta, ya el legislador ha considerado, implícitamente, que al equiparar a los hijos "adulterinos" con los naturales, y con los legítimos en cuanto a derechos hereditarios, bajo la ley núm. 448 de 1947, no constituye un escándalo y una inmoralidad.

Estamos conscientes de que hemos criticado las bases teóricas del art. 116 de nuestro Código Civil. Al así hacerlo, no pretendemos legislar judicialmente ni sustituir nuestro criterio por el del legislador. Si en Puerto Rico no se hubiese legislado desde el año 1942 en adelante en cuanto a hijos ilegítimos, esto es, si nuestra atención estuviese limitada al art. 116, tendríamos que darle eficacia a la disposición de que "solamente" el marido o sus herederos podrían impugnar la legitimidad, y tendríamos que obedecer el criterio legislativo, independientemente de cualquier posible crítica a que pudiese estar sujeto. Pero hemos expresado nuestro criterio general, en cuanto a los aspectos sociales del problema, no para dejar sin efecto, aisladamente, el art. 116, sino como punto de orientación y referencia en cuanto al impacto de la ley 229 de 1942, así como de las leyes posteriores, sobre el art. 116, y en cuanto a la intención legislativa que inspiró la aprobación de esas leyes, esto es, la modificación del concepto de exclusividad en cuanto a la impugnación de la legitimidad, consecuencia necesaria de las leyes recientes que hemos mencionado, en cuanto a hijos "adulterinos" nacidos con posterioridad a la ley 229 de 1942, tal modificación, repetimos, está basada en postulados de sólida virtualidad, desde el punto de vista del interés social y de la justicia intrínseca. No esta-

mos derogando judicialmente el art. 116. Lo que estamos resolviendo es que el art. 116, interpretado literalmente en el sentido de crear una estricta exclusividad, aprovechable solamente por el marido o sus herederos, no es de aplicación a los hijos "adulterinos" nacidos después de la vigencia de la ley 229 de 1942, ya que tal ley, al crear una nueva causa de acción de filiación, en favor de esos hijos "ilegítimos", les concede la facultad, esencial, y necesaria a la acción filiatoria, de impugnar la legitimidad. En otras palabras, la ley 229 crea una nueva categoría de personas que pueden impugnar la legitimidad, y en ello trasciende y va más allá de los límites de exclusividad establecidos en el art. 116. La situación sencilla es la de una ley general que enumera a ciertos grupos de personas como poseedores de cierta causa de acción, de impugnación de la legitimidad, y la de una ley especial posterior que establece un nuevo grupo de personas a quienes se le reconoce el mismo derecho de impugnación. Lo que sí podría constituir legislación judicial sería el ignorar o convertir en inefectiva la ley 229 de 1942. Si resolviésemos que el art. 116 sigue en toda su efectividad exclusivista, hasta el punto de impedir la impugnación de la legitimidad por los hijos "adulterinos", no obstante las disposiciones de la ley 229, entonces la declaración de que tales hijos son naturales, carecería de realidad y de eficacia práctica, ya que ellos no podrían instar con éxito una acción de filiación, en vista de que no podrían impugnar su legitimidad, cuya impugnación sería un requisito esencial para la acción de filiación. La ley 229 funcionaría en el vacío de la inutilidad. Los nuevos derechos sustantivos creados por tal ley no tendrían significación, por falta de los remedios judiciales necesarios para su consagración. La tesis de la continuación de la exclusividad contenida en el art. 116 conllevaría una derogación judicial práctica de la ley 229 del 1942. No es función de los tribunales el impedir que se cumpla la voluntad legislativa expresada a través de tal ley 229, de concederle nuevas oportunidades, derechos y remedios judiciales a los hijos conocidos anterior-

mente por adulterinos. Los argumentos generales que hemos expuesto al señalar las fallas inherentes al art. 116, coinciden con el clima de profunda justicia social que ha logrado expresión a través de la ley 229.

Se podría alegar que las leyes 229 de 1942 y 243 de 1945 son aplicables solamente, de acuerdo con sus propios términos, a hijos nacidos fuera de matrimonio y que, por lo tanto, no son de aplicación al caso de autos, en que la madre del menor era una mujer casada, no habiendo nacido el niño fuera de matrimonio, según ese argumento. Ello conlleva la tesis de que tales leyes son aplicables solamente a hijos "adulterinos" de padres casados, pero no de madres casadas. Es cierto que en el título y la sec. 1 de la ley 229 se indica que la ley es aplicable a hijos nacidos "fuera de matrimonio". Pero fué precisamente el propósito de la ley 229 el cubrir a los hijos adulterinos y el concederles derechos más amplios, convirtiéndolos en hijos naturales. La sec. 1 establece que "serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta ley, *independientemente de que sus padres hubieran podido o no contraer matrimonio al tiempo de la concepción de sus hijos*". (Bastardillas nuestras.) La inhabilidad de los padres para casarse entre sí conlleva o incluye el hecho de que uno de los padres esté casado con otra persona, esto es, que el hijo sea adulterino, y se convierte en hijo natural según la sec. 1. La sec. 2 habla de hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de la ley *que no tenían la condición de hijos naturales según la legislación anterior*, esto es, que eran hijos adulterinos. La ley se refiere a toda clase de hijos adulterinos. No establece distinción alguna entre un hijo de una mujer o madre casada y un hijo de un hombre o padre casado. Donde la ley no distingue, los tribunales no deben establecer distinción. Sería irrazonable e injusto el suponer que la ley, silenciosa en cuanto a distinciones, haya pretendido crear un discrimen, concediendo beneficios y derechos como hijo natural al hijo de un padre casado y al mismo tiempo negando

tales beneficios y derechos al hijo de una madre casada. La ley no debe interpretarse en el sentido de que exista un conflicto entre la evidente aplicación de sus disposiciones a hijos adulterinos, y su aplicación a hijos nacidos "fuera de matrimonio". De existir tal conflicto, la ley estaría utilizando términos antagónicos entre sí y mutuamente exclusivos. La ley se estaría neutralizando a sí misma, y estaría concediendo derechos, negándolos al mismo tiempo. Sería una ley inútil. La interpretación de una ley no debería llegar hasta su eliminación total, y tal ley no debería ser interpretada como estableciendo discrímenes que no han sido expresados en la propia ley. La forma más razonable, justa, y congruente con el propósito de la ley, de interpretar la frase "hijos nacidos fuera de matrimonio", consistiría en identificar tal concepto con el de hijos que, *de hecho*, no son legítimos, esto es, que, *de hecho*, nazcan fuera de matrimonio porque uno de los padres esté casado con otra persona. Como cuestión de derecho, esos hijos podrían ser considerados como legítimos hasta tanto tenga éxito una acción de impugnación de legitimidad. Como cuestión de derecho, ellos nacerían "dentro del matrimonio", aunque, como cuestión de hecho, sean adulterinos. La ley no sería aplicable a hijos legítimos como cuestión de hecho real, esto es, cuando sus dos padres estén casados entre sí. Pero la ley sí es aplicable a hijos adulterinos nacidos fuera de matrimonio, por el hecho de que los dos padres no están casados entre sí, esto es, a hijos que no son el producto de un matrimonio, que nazcan fuera de matrimonio, como cuestión de hecho. Con esa interpretación realista se armonizan las distintas disposiciones de la ley, se evitan conflictos y discrímenes, y se le da pleno margen al propósito legislativo de proteger a los hijos adulterinos, en forma compatible con los postulados de humanismo, justicia esencial e igualdad básica entre los hombres.

No hemos olvidado el hecho de que en este caso se trata, originalmente, de una demanda de alimentos, y no de una acción de filiación, y que los casos que estamos revocando, de

*Pueblo* v. *Santiago*, supra, y *Pérez* v. *Rosario*, supra, envolvían demandas de alimentos. Pero en esta clase de casos la acción predominante debe ser la de filiación, y la reclamación de alimentos debe ser considerada como incidental a la acción filiatoria. Para que pueda tener éxito la reclamación de alimentos contra el alegado padre verdadero, que no es el esposo de la madre, se hace preciso el establecer la paternidad, esto es, la relación de padre e hijo entre el menor demandante y el demandado. Ello conlleva necesariamente la impugnación de la paternidad del esposo de la madre, esto es, la impugnación de la legitimidad. La destrucción de un *status* prevaleciente de legitimidad constituye un efecto necesario del éxito de la reclamación del demandante. Sería irrazonable el resultado de que se establezca el derecho a alimentos contra el demandado, a base de que éste es el padre del demandante, y al mismo tiempo conservar el demandante su *status* como hijo legítimo del esposo de la madre. El demandante no podría tener dos padres. Por lo tanto, siempre habría que considerar destruído el *status* del demandante como hijo legítimo del esposo de la madre. De limitarse la controversia al derecho a alimentos, el demandante estaría perdiendo un *status* de legitimidad sin establecer una nueva filiación, esto es, sin adquirir un nuevo *status.* No tendría estado alguno. Para evitar esa consecuencia socialmente indeseable, la acción predominante debe ser la de filiación, siendo el derecho a alimentos una consecuencia incidental del establecimiento de la filiación. La proposición básica envuelta es la de la relación filial del menor, y la de la identificación de su verdadero padre. El derecho a alimentos surge de la filiación, la cual debe establecerse previamente. El posible *status* del demandante como hijo natural del demandado conlleva el derecho a alimentos como consecuencia y no como origen básico. La paternidad no surge del derecho a alimentos, sino que este último surge de la paternidad. Antes de la ley 229, el hijo adulterino tenía derecho solamente a alimentos, mientras que bajo esa ley tal hijo tiene todos los de-

rechos de un hijo natural, siendo el derecho básico el de establecer su filiación. No vemos razón alguna, en casos como el de autos, que impida resolver la controversia en un solo procedimiento, en que la acción de filiación sea la predominante. Por lo tanto, al devolverse el caso al tribunal de primera instancia, las partes, y especialmente la parte demandante, deben enmendar sus alegaciones para que el caso se plantee a base de una acción de filiación, con la prueba correspondiente a tal acción, todo ello a los fines de evitar que el *status* jurídico del menor quede en un vacío. Como secuela de las anteriores normas, debemos indicar, colateralmente, que en una situación como la del caso de autos, no debería tramitarse una reclamación criminal de abandono o de reclamación de alimentos sin que antes se haya establecido la verdadera filiación del reclamante en un procedimiento civil a tal efecto.

Aun en el marco de la reclamación de alimentos, que debe ser incidental a la acción de filiación, según acabamos de resolver, el art. 116 no debe ser impedimento al derecho a alimentos, que es consecuencia del éxito de la acción filiatoria. Incidentalmente, los arts. 128 y 129 de nuestro Código Civil, que tenían plena e incuestionable vigencia antes de la aprobación de la ley 229 de 1942, disponen lo siguiente:

"Artículo 128: Los hijos ilegítimos en quienes no concurra la condición legal de naturales, sólo tendrán derecho a exigir de sus padres alimentos, conforme al artículo 143.

"Artículo 129: El derecho a los alimentos de que habla el artículo anterior, sólo podrá ejercitarse:

"1.—Si la paternidad o maternidad se infiere de una sentencia firme dictada en proceso criminal o civil.

"2.—Si la paternidad o maternidad resulta de un documento indubitado del padre o de la madre, en que expresamente reconozca la filiación."

Esos dos artículos corresponden a los 139 y 140 del Código Civil de España. Los tribunales y comentaristas españoles han interpretado esas disposiciones al efecto de que un hijo ilegítimo (no natural) no puede instar con éxito una

reclamación de alimentos a menos que *previamente*, y antes de presentarse la acción de alimentos, se haya dictado una sentencia firme de la cual se infiera la paternidad. (Sentencias del Tribunal Supremo de España de 9 de abril de 1908; 4 de junio de 1912; 15 de febrero de 1916 y 23 de junio de 1919; 1 Manresa 655 et seq., sexta ed., corregida y aumentada.) Al hablar el art. 129 de una sentencia firme dictada en un proceso civil, se refiere a la sentencia dictada en una acción de impugnación de legitimidad, (3 Scaevola, Código Civil, pág. 432, 5ª ed.), esto es, antes de que el hijo ilegítimo pueda reclamar alimentos, debe haberse entablado con éxito una acción de impugnación de la legitimidad. Esa interpretación literal de los dos artículos en discusión se ha basado en la tesis, enunciada en las opiniones de España que hemos citado, de que fué el propósito del legislador el restringir los beneficios de los hijos adulterinos, hasta el punto de prohibir la investigación de la paternidad, excepto en los casos excepcionales señalados en el art. 129, y el de proteger la familia legítima.

Aun antes de la nueva legislación liberal aprobada en Puerto Rico, este Tribunal, con amplia y profética visión, ya había destruído las cadenas, cruelmente restrictivas, de la literalidad en la interpretación del art.129. En el caso de *Rivera* v. *Cardona*, 56 D.P.R. 819, se resolvió que la sentencia firme de la cual se infiriese la paternidad no era una condición previa a una reclamación de alimentos, y que la propia sentencia en el caso en sí de alimentos era o es la sentencia a que se refiere el art. 129.

Como ya hemos visto, la ley 229 de 1942 eliminó la categoría de hijos adulterinos y convirtió a estos últimos en hijos naturales. Por lo tanto, ha desaparecido la razón de ser de los arts. 128 y 129 del Código Civil, que limita a los hijos "adulterinos" al derecho a alimentos, siempre que su paternidad se infiera de una sentencia firme (que, en España, se consideraba como la sentencia que se dictase en un procedimiento anterior de impugnación de la legitimidad). Los de-

rechos de tales hijos, anteriormente "adulterinos", se determinan, al amparo de la ley 229, por el art. 127 de nuestro Código Civil, que se refiere a los derechos de los hijos naturales. Es evidente que bajo el art. 127 no es necesario, como condición previa a la obtención de tales derechos, el que la paternidad se infiera de una sentencia firme anterior. Claramente, no es necesaria la acción previa de impugnación de legitimidad. Tal impugnación ahora es incidental al establecimiento de la filiación y al reconocimiento, también incidental, del derecho a alimentos. Por lo que ya hemos indicado en el curso de esta opinión, la facultad incidental de impugnar la legitimidad se ha concedido a los hijos, antes adulterinos y ahora naturales, por la ley 229 de 1942.

Ya hemos resuelto que al devolverse este caso al tribunal a quo, deben enmendarse las alegaciones para que la acción predominante sea una de filiación. También debemos indicar que Rodolfo Rodríguez Meléndez, esposo de la demandante y apelante Gregoria Agosto, no ha sido incluído como parte en este litigio. Como ya hemos visto, esta reclamación de alimentos envuelve una impugnación a la legitimidad del menor. De tener éxito tal impugnación, dicho menor no podría ser considerado como hijo de Rodolfo Rodríguez Meléndez. Por lo tanto, la sentencia que se dicte en este caso afecta directamente los intereses y derechos esenciales de dicho Rodolfo Rodríguez Meléndez, ya que podría quedar destruída su paternidad sobre el menor. El esposo Rodolfo Rodríguez Meléndez es y debe ser una parte indispensable en este litigio. Una parte indispensable es aquella cuya presencia es requerida para que la corte pueda hacer una adjudicación definitiva en cuanto a todas las personas envueltas, y es aquélla que tiene un interés en el litigio de tal naturaleza que no pueda dictarse una sentencia sin afectar ese interés o sin dejar la controversia en tales condiciones que su terminación, sin la presencia de esa parte, es inconsistente con la equidad y con una conciencia limpia. *Ríos* v. *Mercado*, 73 D.P.R. 840; *Pueblo* v. *Henneman*, 61 D.P.R. 189. La ausencia de Rodolfo Ro-

dríguez Meléndez como parte en este caso implicaría la invalidez de cualquier posible sentencia que se dicte. Por lo tanto, dicho Rodolfo Rodríguez Meléndez debe ser incluído como parte en el tribunal a quo para que puedan continuarse los procedimientos en este caso.

Como observación adicional debemos indicar que, siguiendo la norma sentada en *Chabrán* v. *Méndez*, 74 D.P.R. 768, el tribunal a quo debería nombrar, en el caso de autos, un defensor judicial que represente al menor, en vista del posible conflicto de intereses de la madre y del menor.

Debe revocarse la sentencia apelada y devolverse el caso al tribunal a quo para que allí puedan seguirse los procedimientos posteriores que no sean incompatibles con esta opinión.

---

Opinión disidente omitida por Juez Asociado Sr. Sifre, en la cual concurren los Jueces Asociados Sres. Marrero y Pérez Pimentel.

El Juez Asociado Sr. Ortiz ha llegado a la conclusión que de acuerdo con la Ley 229 de 12 de mayo de 1942, enmendada por la núm. 243 del año 1945, "un hijo anteriormente conocido como 'adulterino', nacido con posterioridad a la vigencia de dicha ley", de madre casada, "tiene desde el momento de su nacimiento la condición de hijo natural", y el derecho a instar una acción de filiación, y por tanto, el de impugnar su legitimidad con el fin de obtener sentencia declarando que no es hijo del esposo de la madre, y sí natural de otro hombre, sin que lo impida el artículo 116 del Código Civil, de acuerdo con el cual la filiación legítima *solamente* puede ser atacada por el marido o sus legítimos herederos.

A las disposiciones de ese artículo les dimos efectividad en *Pueblo* v. *Santiago*, 70 D.P.R. 837, manifestando que "Al especificar el Código quiénes pueden impugnar la legitimidad, naturalmente, excluyó a aquéllos que no mencionó en el citado artículo". En *Pérez* v. *Rosario*, 72 D.P.R. 514, expre-

samos el criterio de que una hija nacida durante el matri-
monio, tenía la presunción de ser legítima, no pudiendo la ma-
dre por sí destruir esa presunción para convertirla en na-
tural a virtud de la Ley 229, según fué enmendada por la
núm. 243 de 1945. Mi ilustrado colega cita esos preceptos,
pero para repudiarlos "especialmente en vista de las disposi-
ciones, el espíritu y de la nueva tónica de nuestra legislación
reciente", lo que da la errónea impresión de que no fué con-
siderada esa legislación al resolverse el último de los casos ci-
tados.

Estoy plenamente convencido que la doctrina enunciada
en esas decisiones, y reiterada últimamente en *Chabrán* v.
*Méndez*, 74 D.P.R. 768, es la correcta y que no lo es la que
expone en su opinión el Juez Asociado Sr. Ortiz, doctrina que
es secuela de una interpretación equivocada de la Ley 229.

El problema que quiso afrontar la Asamblea Legislativa
al aprobar esa ley, fué el relacionado con el estado y derechos
de los hijos extramatrimoniales. Era ése el que le preocu-
paba, y lo resolvió borrando las diferencias que existían en-
tre tales hijos, derivadas de la diferente condición de sus pa-
dres, incluyéndolos a todos en la categoría de naturales. Ése
y no otro fué el propósito de dicha legislación y se logró—reme-
diándose así una situación manifiestamente injusta—sin ne-
cesidad de afectar "a la institución familiar originada en el
matrimonio", y dejando "subsistente" la condición de los hijos
reputados legítimos, según los preceptos del Código Civil. (1)
Para darles la categoría de naturales a los que no la tenían
antes de la aprobación de la citada ley, no había por qué al-
terar los principios reguladores de la filiación matrimonial,
ni debilitar las salvaguardias que la protegen.

Conforme al art. 113 de dicho Código, los hijos de madre
casada, nacidos después de los ciento ochenta días siguientes
al de la celebración del matrimonio y antes de los trescientos
siguientes a su disolución, son hijos legítimos y se atribuyen

_____

(1) Anotaciones al Código Civil, Dr. Luis Muñoz Morales, Vol. 1,
pág. 407.

por ley al marido. (²) Como hemos visto, solamente éste o sus legítimos herederos pueden atacar la filiación legítima. Art. 116. La Ley 229 fué aprobada por el poder legislativo con conocimiento de esos preceptos, y al disponer en la sec. 1 de la misma que "Serán hijos naturales todos los . . . *nacidos fuera de matrimonio* . . .", lo hizo conscientemente, expresando en términos inequívocos la intención de darles ese carácter a los extramatrimoniales, y no a los que son hijos nacidos de matrimonio; y sin intención alguna de modificar las normas del Código Civil concernientes al sistema de la descendencia legítima, para concederle al hijo reputado legítimo, el derecho a impugnar su legitimidad.

Sostengo que la Ley 229 no derogó o enmendó las disposiciones de los arts. 113, 116 y otros concordantes del Código Civil, de acuerdo con los cuales, el hijo de madre casada nace con el estado personal de hijo legítimo, que conserva mientras no sea destruído por los medios establecidos en esas disposiciones, lo que solamente puede suceder a instancias del marido o sus legítimos herederos, *toda vez que tales medios no fueron ampliados por la mencionada ley.*

Si con ésta se hubiera querido debilitar, en cuanto a los hijos nacidos con posterioridad a su vigencia, la presunción de legitimidad consagrada en el art. 113, y es ésa una de las consecuencias inevitables de la tesis de mi ilustrado colega; si se hubiera tenido la intención de que fueran inaplicables a tales hijos los preceptos del art. 116, o el propósito de enmendarlos, para incluir a éstos entre los que pueden atacar la filiación matrimonial, no es de dudarse que se hubieran expresado esos propósitos, legislándose claramente para lograrlos, y haciéndose en nuestro derecho positivo los reajustes necesarios para evitar confusión y desconcierto en cuanto a las normas jurídicas de aplicación a un problema tan serio y delicado como el que discuto. El no haberlo hecho, limi-

---

(²) La madre de Raúl Agosto casó con Rodolfo Rodríguez Meléndez en 18 de enero de 1945, y Raúl nació en 13 de mayo de 1950, subsistiendo el matrimonio.

tándose el legislador a disponer en la sec. 1 de la Ley 229 que "Serán hijos naturales los . . . nacidos fuera de matrimonio . . . , independientemente de que sus padres hubieran podido casarse al tiempo de la concepción de dichos hijos", demuestra a mi juicio, que dicha ley tiene el alcance que yo le doy, y no el que le reconoce el Juez Asociado Sr. Ortiz, alcance que sin duda alguna, habrá de ser fuente de serios conflictos, de los cuales no podrá hacerse responsable al poder legislativo.

Repito que la citada ley no derogó o enmendó las referidas disposiciones del Código Civil. No lo hizo expresa o tácitamente. No hay entre la primera y las segundas conflicto alguno, si la Ley 229 es interpretada en consonancia con la voluntad legislativa. El conflicto surge, y por cierto muy grave, cuando se hace caso omiso de esa voluntad.

Considerando el propósito de dicha legislación, soy de opinión que la misma es aplicable (1) a los hijos que eran naturales antes de la vigencia de la misma, (2) a los nacidos de madre soltera, sin que tenga importancia alguna el estado o condición del padre, (3) a los hijos de madre casada, cuando la filiación legítima quede excluída conforme a los preceptos del Código Civil, caso que no es el frecuente, porque el adulterio de la madre es la excepción.

Ésa es, a mi juicio, la interpretación de que es susceptible la Ley 229, y con ella no se le está quitando eficacia a sus disposiciones, y mucho menos eliminándolas, ni creando ningún "conflicto entre la evidente aplicación de las mismas" a los hijos adulterinos, y su aplicación "a hijos nacidos fuera de matrimonio", como erróneamente arguye el Juez Asociado Sr. Ortiz. Antes de que entrara en vigor, un hijo adulterino de mujer soltera y padre casado, era un paria social, hijo ilegítimo no natural, y continuaba como tal toda su vida, y un hijo de madre casada, una vez destruída su filiación matrimonial, se encontraba y permanecía en la misma situación. En virtud de los claros preceptos de dicha ley, esos hijos nacidos con posterioridad a su vigencia, tienen la categoría de

naturales, con todos los derechos que les reconoce nuestra legislación, pero para que el hijo de madre casada pueda tenerla, es preciso que pierda primero el estado de legitimidad, lo que sólo puede suceder repito, a instancias del marido o sus legítimos herederos. En vista de las consecuencias eminentemente trascendentales y prácticas de las disposiciones de la Ley 229, no veo cómo es posible sostener que pierden ellas eficacia interpretadas en la forma expuesta, y mucho menos, que queden destruídas o eliminadas.

Mi colega el Juez Asociado Sr. Ortiz, está en desacuerdo con esa interpretación. Según su criterio "Un hijo anteriormente conocido como 'adulterino', nacido con posterioridad a la vigencia de dicha ley, tiene desde el momento de su nacimiento la condición de hijo natural . . .", aunque nazca de madre casada, en vista de que aquélla no establece "distinción alguna entre un hijo de mujer o madre casada y un hijo de un hombre o padre casado". Entiende dicho magistrado que "Sería irrazonable e injusto el suponer que la ley, silenciosa en cuanto a distinciones, haya pretendido crear un discrimen, concediendo beneficios y derechos al hijo de un padre casado y al mismo tiempo negando tales beneficios y derechos al hijo de una madre casada". De ahí parte para llegar a la conclusión de que este último, de sostener que no es hijo del marido de la madre, y sí de otro hombre, puede impugnar la paternidad legítima en una acción de filiación, para que se declare que no lo es del primero, y sí natural del segundo.

En primer término, se incurre en error cuando se asevera que un hijo nacido con posterioridad a la vigencia de la Ley 229, conocido anteriormente como adulterino, "tiene desde el momento de su nacimiento la condición . . . de natural". Ese hijo nacía y nace, de acuerdo con la legislación aplicable al caso de autos, con el estado de legítimo, y está fuera del ámbito de la Ley 229, por tratarse de un hijo nacido *dentro* de matrimonio. En segundo lugar, la ley distingue entre un hijo de madre casada y un hijo de mujer soltera, puesto que expresamente se refiere a los hijos nacidos *fuera* de matri-

monio, y no lo son los que nacen de madre casada, mientras ostentan la filiación legítima. Una vez que quede destruída esa filiación con sujeción a los medios establecidos en el Código Civil, son adulterinos esos hijos, y de acuerdo con dicha ley, tienen entonces la categoría de naturales, con iguales beneficios y derechos que los otros. Es decir, que con la interpretación que combate el Juez Asociado Sr. Ortiz, no se establece u ocasiona discrimen alguno. La ley, y esto es evidente, no niega a los hijos de madre casada, cuya legitimidad haya sido excluída, beneficios y derechos concedidos a los otros hijos que están dentro del alcance de la misma, pero ciertamente que no se los reconoce mientras se interponga el estado de legitimidad. Por último, el argumento de dicho magistrado al efecto de que la Ley 229 debe ser interpretada en el sentido de que concede iguales beneficios y derechos a los hijos nacidos de madre soltera y a los nacidos de madre casada, demuestra concluyentemente lo equivocada que es la tesis en que descansa su opinión, tesis que equivale a sostener que la doctrina del reconocimiento es una misma para los unos y para los otros.

La filiación se establece mediante el reconocimiento voluntario o mediante el ejercicio de la acción de reconocimiento forzoso. Es principio general que los hijos que no pueden ser reconocidos voluntariamente, no pueden instar la acción para que lo sean forzosamente. El art. 125 del Código Civil prescribe que el hijo natural puede ser reconocido voluntariamente por el padre o la madre conjuntamente, o por uno sólo de ellos, y también dispone que éstos se encuentran obligados a hacerlo en los casos mencionados en dicho artículo, el que, según la conclusión a que llegara el Juez Asociado Sr. Ortiz en *Figueroa* v. *Díaz*, 75 D.P.R. 163, 182, de la que sólo discreparon los Jueces Asociados Sres. Negrón Fernández y Belaval, quedó en todo su vigor "en cuanto a los requisitos de prueba contenidos" en el mismo, siendo aplicables sus preceptos "a las acciones de filiación iniciadas por hijos naturales nacidos con posterioridad a la vigencia" de la Ley 229, cri-

terio que concuerda con el expresado por el Dr. Luis Muñoz Morales en sus Anotaciones al Código Civil, Vol. 1, pág. 407, al decir que en virtud de dicha ley, el párrafo primero del referido artículo, que disponía que "Son hijos naturales los nacidos fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos, hubieran podido casarse, sin dispensa o con ella", debía entenderse enmendado en el sentido de proveer que "Son hijos naturales los nacidos fuera de matrimonio, independientemente de que sus padres hubieran podido o no, contraer matrimonio al tiempo de la concepción o del nacimiento del hijo", quedando inalteradas las restantes disposiciones. Una de ellas es, como se ha visto, la que autoriza el reconocimiento voluntario del hijo natural por el padre o la madre conjunta o separadamente.

Interpretada la Ley 229 como lo hace mi distinguido colega, esto es, en el sentido de que no establece distinción alguna entre hijos de madre casada, que sostengan ser adulterinos, e hijos de madre soltera, y en el sentido de que les concede a los unos y a los otros iguales beneficios y derechos, nos encontraríamos con el absurdo jurídico de que una madre podría reconocer voluntariamente como natural al hijo cuya paternidad se le atribuye por ley al marido, bien conjuntamente con el que se considere que es padre, o por ella separadamente, pudiéndose así destruir la filiación matrimonial, sin intervención alguna del marido, del hijo o de los tribunales, privando al primero de la paternidad legítima, y al hijo, "personaje central en el drama", según dicho magistrado, del estado de legitimidad, que estaría a merced de la madre, para darle la condición de natural, alteración de estado que el Juez Asociado Sr. Ortiz, aparentemente considera que representa *un beneficio*. En efecto el estado de legitimidad y las salvaguardias que le dan protección, quedarían con escasísimo valor, y la institución del matrimonio, que no dejó de ser la base normal de la familia con la aprobación de dicha ley, minada en sus cimientos.

Si no es posible admitir el absurdo del reconocimiento voluntario del hijo de madre casada, mientras ostente la filiación matrimonial, me parece que es inevitable la conclusión de que es erróneo sostener que las normas del reconocimiento son las mismas para ese hijo y para el nacido de mujer soltera, e igualmente erróneo decir que el uno y el otro gozan de iguales beneficios, y que el primero, que no puede ser reconocido voluntariamente, tiene el derecho a instar una acción de filiación, para que se declare que es hijo natural de un varón, que no es el marido de la madre, sosteniendo que no es hijo del hombre a quien le es atribuído por ley. Reitero que el argumento que se esgrime sobre la llamada igualdad de beneficios y derechos entre los hijos nacidos que son naturales, según la interpretación que le da a la Ley 229 el Juez Asociado Sr. Ortiz, demuestra definitivamente que esa interpretación es absolutamente errónea.

La conclusión a que llega dicho magistrado descansa en más de una teoría, como paso a demostrar. Las he tratado en conjunto, y ahora he de referirme a algunas de ellas en particular.

Se sostiene que "La Ley 229 crea una nueva categoría de personas que pueden impugnar la legitimidad, y en ello trasciende y va más allá de los límites de exclusividad establecidos en el art. 116 del Código Civil". No, dicha legislación simplemente reafirmó que son hijos naturales aquéllos que lo eran con anterioridad a su vigencia, e incluyó en esa categoría a los que nacieran con posterioridad, que antes tenían la condición de ilegítimos no naturales. Ciertamente que no creó una "nueva categoría de personas que pueden impugnar la legitimidad", puesto que, como tantas veces he dicho, no hubo propósito alguno, y no es posible inferirlo, de modificar las normas de nuestro derecho positivo relativas a la impugnación de la filiación legítima.

También se sostiene, que se trata de una situación "sencilla . . . de una ley general que enumera a ciertos grupos de personas poseedoras de cierta causa de acción, la de impugna-

ción de la legitimidad", (supongo que se refiere al art. 116 del Código Civil), "y la de una ley especial (la 229) que establece un nuevo grupo de personas (los hijos) a quienes se les reconoce el mismo derecho . . .". Ya he demostrado que a éstos no se les reconoce ese derecho. Incúrrese en craso error cuando se dice que la Ley 229, *es una ley especial.* No lo era, ni lo es el art. 125 del Código Civil, las disposiciones del cual, conjuntamente con las de la Ley 229, establecen las normas para el reconocimiento de los hijos naturales, *Figueroa* v. *Díaz,* supra. Si las del referido artículo son de carácter general, y eso lo admite mi ilustrado colega, no me explico en qué se funda para decir que no lo son las de la Ley 229.

Se arguye que "La forma más razonable, justa y congruente con el propósito de la ley, de interpretar la frase 'hijos nacidos fuera de matrimonio', consistiría en identificar tal concepto con el de hijos que, *de hecho,* no son legítimos, esto es, que de hecho, nazcan fuera de matrimonio porque uno de los padres esté casado con otra persona", y que "como cuestión de derecho, esos hijos *podrían* ser considerados como legítimos hasta tanto tenga éxito una acción de impugnación de legitimidad". (Bastardillas nuestras.) En cuanto a los hijos de mujer soltera y padre casado no existe ningún problema porque no está envuelto el estado de legitimidad. En lo que se refiere a un hijo de madre casada, no hay duda de que si resultare ser, como cuestión de hecho, adulterino, puede encontrar protección en la Ley 229, pero ese hecho, no puede establecerlo el hijo. Se me hace imposible comprender lo que quiere decirse cuando se manifiesta que los hijos de madre casada podrían ser considerados como legítimos. No es que *podrían* serlo. Es que hay que considerarlos así, a no ser que se haga caso omiso, con infracción de preceptos perfectamente claros, del estado de legitimidad con que nacen esos hijos, privándoles de una de sus mayores garantías, consagrada y respetada por las leyes de la inmensa mayoría de los pueblos civilizados.

Nos dice el Juez Asociado Sr. Ortiz, que la Ley 229 enmendó implícitamente el art. 116 del Código Civil, ampliándolo para incluir a los hijos, entre aquéllos que pueden atacar la filiación matrimonial. Me parece haber dejado establecido que esto no es así. Quiero añadir que esa teoría está en conflicto con las anteriores, según las cuales *dicho artículo no es aplicable* a los hijos nacidos con posterioridad a la vigencia de dicha ley.

Se argumenta que "Bajo la situación legislativa anterior (a la Ley 229), tenía eficacia y virtualidad la disposición del art. 116 del Código Civil al efecto de que la legitimidad podía ser impugnada solamente por el marido o sus herederos", no pudiendo el hijo adulterino atacarla "especialmente en vista de que él no podía entablar una acción de filiación . . .", pero que la "Ley 229 de 1942 conlleva el pronunciamiento de que el hijo natural puede también impugnar su propia legitimidad". ¿Dónde está ese pronunciamiento? Afirmo que no puede encontrarse. Los preceptos del citado artículo, que se refieren al sistema de la descendencia legítima, no tuvieron esa motivación. Existen en nuestro derecho por otras razones muy trascendentales.

Dice mi ilustrado colega, que "La Ley 229 . . . ensancha los caminos que llegan a la verdad, y abre las puertas que estaban tapiadas por el art. 116". En *Figueroa* v. *Díaz*, supra, no entendió que la ley había ensanchado los caminos y abierto las puertas para llegar a la verdad de que un hijo natural tiene derecho al reconocimiento forzoso. ¿A qué verdad se refiere ahora? Aparentemente a la que llama "realidad filiatoria". Si ello es así, *esa realidad* en cuanto a los hijos que nacen de madre casada, es la de que éstos tienen el estado personal de legítimos, hasta que esa realidad deje de serlo, a solicitud de quienes pueden cuestionarla.

Poco quiero decir sobre la sentencia del Tribunal Supremo de España de 20 de marzo de 1919. La considero inaplicable, entre otros motivos, porque los hechos y circunstancias que tuvo ante sí dicho Tribunal son completamente distintos

a los que encontramos en este recurso. Si estuviera equivocado al sostenerlo, no lo estaría al decir que ese fallo aislado y solitario, no ha debido considerarse como precedente para revocar la doctrina establecida en nuestras decisiones. Además, sosteniéndose como se sostiene por el Juez Asociado Sr. Ortiz, la teoría, entre otras, de que el art. 116 del Código Civil, fué enmendado implícitamente por la Ley 229 para darle al hijo el derecho a impugnar su legitimidad, no veo por qué se invoca dicha sentencia.

Lamento que la mayoría del Tribunal se retracte ahora de lo que expresó por unanimidad en *Chabrán* v. *Méndez*, supra, resuelto en 24 de abril de 1953. (³) Dijimos entonces que debía tenerse "en cuenta que bajo el artículo 116 del Código Civil sólo el marido o sus legítimos herederos pueden impugnar la legitimidad del hijo", citando con aprobación lo resuelto en *Pueblo* v. *Santiago*, supra. También expusimos que "La Asamblea Legislativa le ha colocado (al hijo) un obstáculo en el camino—el artículo 116 del Código Civil. Por consiguiente, el menor no puede proseguir con el asunto a menos y hasta que los herederos legítimos de Frank Chaulón tomen alguna acción bajo el artículo 116". Añadimos, refiriéndonos al problema social allí envuelto, que en parte también lo está en el presente litigio, problema que entonces caracterizamos de "altamente sensitivo", que "La Asamblea Legislativa ha erigido un número de salvaguardias, según constan en el artículo 116 y en otros del Código Civil". (⁴) Esas salvaguardias han sido destruídas sin justificación alguna, habiéndose desechado una doctrina enteramente correcta, para adoptar en su lugar una que es manifiestamente errónea.

La sentencia apelada ha debido confirmarse por ajustarse a derecho.

---

(³) El hijo en el caso de *Chabrán* v. *Méndez*, supra, nació después de aprobada la legislación de 1942 y 1945.

(⁴) Dí mi conformidad a esas manifestaciones, estando perfectamente consciente de la existencia de la Ley 229.