JOSÉ G. MORENO ÁLAMO, representado por su madre ITRIA ÁLAMO DE MORENO, demandante y recurrida, *v.* JOSÉ GUILLERMO MORENO JIMÉNEZ, IDYS JIMÉNEZ GONZÁLEZ y FERNANDO AYALA, demandados y recurrentes.

Número: R-78-223     Resuelto: 30 de marzo de 1982

*Máximo Ruidíaz*, abogado de los demandantes y recurridos; *Myra S. Gaetán, Procuradora Especial de Relaciones de Familia*, defensora judicial del menor co-demandado José Guillermo Moreno Jiménez; *Antonio González Géigel*, abogado de los demandados y recurrentes.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Tres postulados básicos inspiran nuestra decisión. Primero, que en su función normativa y remedial el Derecho atiende y tutela necesidades, problemas y experiencias del ser humano. Éste, como autor y receptor de la ley, le nutre e inyecta en gran medida, a las soluciones que provee, su conocimiento y juicio valorativo ideológico, moral y económico. Segundo, que la norma legal no es enemiga —o no debe serlo— de la verdad científica. Son entera y perfec-

tamente reconciliables. Y tercero, que la realidad científica, al igual que los factores sociales contemporáneos que circundan la vida del derecho —*Rivera Pitre* v. *Galarza Martínez*, 108 D.P.R. 565, 573 (1979)— no pueden ser descartados por los tribunales en abono de un estado negatorio de la realidad de las cosas o de la personalidad humana. Expongamos los hechos.

Idys Jiménez González, de 19 años, casada pero *separada* desde enero de 1974 de su esposo Fernando Ayala Rodríguez conoció el 24 de mayo de 1974 a José Guillermo Moreno Álamo de 16 años. A la semana comenzó a sostener, con este último, relaciones íntimas que prosiguieron subsiguientemente hasta que debido a su estado avanzado de embarazo las suspendieron. José sabía que Idys estaba casada con Fernando y tenía una niña del matrimonio nombrada Aixa, razón por la cual éstos esporádicamente se veían en ocasión de Fernando ejercer su derecho paterno-filial. La prueba tiende a indicar que Idys y su esposo Fernando, desde la separación no sostuvieron relaciones sexuales, pero circunstancialmente "no hubo impedimento para que cohabitara excepto la disposición anímica contra ello de Idys, al menos". El 31 de marzo de 1975 Idys dio a luz un varón, y el 3 de abril José acudió voluntariamente con ella al Registro Demográfico y lo inscribió como suyo nombrándolo José Guillermo Moreno Jiménez. Subsiguientemente se enfriaron las relaciones entre Idys y José. Con el tiempo Idys y Fernando se divorciaron.

Así las cosas, José, por conducto de su madre, demandó a Idys, Fernando y al niño impugnando ese reconocimiento, invocando la presunción de legitimidad de todo hijo nacido vigente un matrimonio. A Fernando se le anotó la rebeldía. Oportunamente la ilustrada sala de instancia dictó sentencia accediendo a lo solicitado y decretando que el menor era hijo "del matrimonio compuesto por Fernando Ayala Rodríguez e Idys Jiménez González", ordenando su

inscripción y la cancelación de la hecha previamente por José. Fundamentó este dictamen en la presunción de legitimidad consagrada en el Art. 113 del Código Civil y en la opinión de varios tratadistas expositores de su importancia como medio para garantizar la paz familiar y la ausencia de un método científico para determinar con precisión el autor de la concepción. Revisamos.

## I

■ En el plano jurídico el Art. 113 crea, a manera de una investidura legal, el estado de presunción filial legítima. Reza:

> Son hijos legítimos los nacidos después de los ciento ochenta días siguientes al de la celebración del matrimonio y antes de los trescientos días siguientes a su disolución.

> Contra esta legitimidad no se admitirá otra prueba que [no sea] la imposibilidad física del marido para tener acceso con su mujer en los primeros ciento veinte días de los trescientos que hubiesen precedido al nacimiento del hijo. 31 L.P.R.A. sec. 461.

■ Su origen se remonta siglos atrás, al derecho romano encarnado en la máxima *pater is est quem nuptiae demostrant*, como principio inspirado en la doctrina médica prevaleciente de Hipócrates. Scaevola, *Código Civil*, 1942, T. 3, pág. 291; Manresa, *Código Civil Español*, 156, Vol. 1, págs. 642–644; Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*, 1947, Parte I, págs. 343–344. En su primer párrafo el precepto consagra ". . . la presunción de legitimidad que, a su vez, se bifurca en dos sentidos: que la concepción ha acaecido vigente el matrimonio y que ha sido por obra del marido. . .". Lacruz Berdejo y Sancho Rebullida, *Derecho de Familia*, 1978, T. II, pág. 22. En otras palabras, un hijo nacido vigente un matrimonio o durante el período señalado en el precepto se presume concebido *en* y *del* matrimonio, esto es, una presunción de paternidad del marido. Los basamentos

circunstanciales específicos que nutren este presupuesto mayor son: matrimonio, concepción durante su existencia, maternidad respecto a la esposa, identidad del hijo con la esposa, y paternidad del hijo respecto del marido. D. Espín Cánovas, *Manual de Derecho Civil Español*, 1975, Vol. IV, pág. 300. Los tratadistas consultados nos ilustran que la premisa que da vida a la misma estaba fundada en la circunstancia histórica de que la *concepción* y la *paternidad* eran *imposibles* de ser objeto de prueba directa en virtud del estado de la ciencia al tiempo de las codificaciones del siglo pasado. Tradicionalmente se han adelantado varias teorías para la existencia de esta presunta paternidad: la dominical, la del matrimonio, la sociológica, la voluntaria, la formalista y la de cohabitación. Las variantes de estas teorías se desarrollan, con mayor o menor énfasis, en los siguientes extremos: la previa y tácita voluntad del marido de estimar suyos los hijos que su esposa conciba; como un corolario de la fidelidad de la mujer; como resultado normal de la comunidad a base del dato empírico de que la mayoría de los hijos de mujeres casadas son legítimos; las limitaciones científicas que entonces había como medio para constatar la verdadera paternidad; como consecuencia de la normal cohabitación de los cónyuges —Lacruz Berdejo y Sancho Rebullida, *op. cit.*, págs. 27-28; y en orden a los datos suministrados por la ciencia médica sobre los límites mínimos y máximos de la duración del embarazo. Espín, *op. cit.*, pág. 301; J. Santamaría, *Comentarios al Código Civil*, 1958, T. I, págs. 176-177; Rivero Hernández, *La Presunción de Paternidad Legítima*, Ed. Tecnos, 1970, pág. 210.

■ Esta presunción de paternidad —de carácter *juris tantum*— es relativa y puede ser destruida mediante prueba en contrario, reconociendo así el legislador el principio de que aun la probabilidad racional en que se funda no es absoluta ni equivalente a la verdad. Mans Puigarnau, *Lógica para Juristas*, Ed. Bosch, 1969, págs.

131-132. No obstante, una rápida incursión de la dimensión comparativa de diferentes legislaciones, refleja las variaciones en la prueba que se admite en su contra. A tal efecto, la glosa tiende a clasificar tales variantes en las categorías de sistema libre, intermedio y restrictivo. Bajo el sistema *libre* —Códigos alemán y suizo— "la prueba podrá verificarse libremente . . . admitiéndose en la práctica las pruebas biológicas (duración de la gestación, grupos sanguíneos, etc.)". El sistema *intermedio* —Códigos francés, italiano y portugués— acepta prueba sobre alejamiento, imposibilidad física de cohabitar y otros supuestos especiales que implican la desaparición de las situaciones normales de convivencia y unión matrimonial tales como la separación *de facto* y judicial, el adulterio, la ocultación del embarazo y otros. Y el sistema *restrictivo* —el español— que, como indica su adjetivo, ordinariamente limita la prueba a demostrar precisamente la imposibilidad de cohabitación y sólo permite las circunstancias de ausencia, impotencia y separación. Espín, *op. cit.*, págs. 305-307.

## II

¿Qué alcance y significado jurídico tiene el segundo párrafo del Art. 113 preceptivo de que la única prueba contra la paternidad legítima será "la imposibilidad física del marido para tener acceso con su mujer"? Con referencia a su equivalente español —Art. 108— la doctrina ibérica, como afirma Espín, muestra "vacilaciones, sustentándose un criterio más restringido, que sólo admite la impotencia y la ausencia, y otro más amplio, que estimando que el Código no limita las causas de la imposibilidad física, *acepta cualquier otra situación fáctica que proporcione la misma prueba*, opinión que sin duda es la más acertada . . .". *Op. cit.*, pág. 307. Manresa entiende que el "silencio del Código autoriza a una amplia interpretación respecto a este punto; incluyendo en las causas de imposibilidad de acceso los hechos que puedan producirla y que

deberán probarse en la forma ordinaria". *Op. cit.*, pág. 650; Puig Brutau, *Fundamentos de Derecho Civil*, 1970, T. IV, Vol. II, pág. 14.

En Puerto Rico, al aprobarse en el año 1902 nuestro Código Civil adoptamos como herencia el precepto concordante español, aunque se "sustituyera la palabra *presunción* que en aquél figura, por la de *legitimidad*, incurriendo así en una falta de precisión jurídica, porque no es contra el hecho de la legitimidad sino contra la presunción legal de la misma que se establecen excepciones". Muñoz Morales, *op. cit.*, pág. 344. En consecuencia, nuestra jurisprudencia en las primeras décadas de este siglo se inclinó a seguir un enfoque restrictivo aunque, en sana y justa hermenéutica, se puede sostener que existían vías para decisiones más anchas, pues nuestra comisión codificadora había rechazado asimilar en nuestro país el precepto 199 español que "presumía legítimo, aunque la madre hubiese declarado contra su legitimidad o hubiese sido condenada como adúltera". Muñoz Morales, *op. cit.*, pág. 345. Esa óptica la ilustra *Cubano* v. *Del Valle*, 69 D.P.R. 579, 581 (1949), que sostuvo, como prueba demostrativa de imposibilidad de acceso, la ausencia, impotencia, presunción o muerte del marido, pero excluyó la separación física de los esposos, ella en Arecibo y él en Manatí. Igual resultado prevaleció en *Burgos* v. *Vázquez*, 48 D.P.R. 416 (1935). Y en *Núñez* v. *Lacot*, 32 D.P.R. 81 (1923), aun en situación de estar los cónyuges separados —viviendo uno en Peñuelas y otro en Ponce— se afirmó que era "imposible para esta corte el hacer excepciones en contra de la letra del Código, por no decir de su espíritu". Pág. 83.

Hoy en día se admite que la justificación de ese enfoque era que esta presunción formaba parte de un diseño o plan maestro que fluía a través del Código Civil que privaba siglo atrás en la época de su desarrollo y redacción. Existía la visión de una familia cerrada, patriarcal, erigida sobre

unos patrones rigurosos éticos, religiosos y socio-económicos. El conocimiento y medios científicos sobre genealogía estaban en una etapa primitiva y poco desarrollada. Así, Manresa detecta que reflejaba "el deseo de no promover cuestiones dudosas en un asunto que dadas nuestras ideas sociales incita siempre al escándalo". *Op. cit.*, pág. 622. Scaevola coincide con el fenómeno de limitación médico-científica exponiendo que "la legitimidad [. . . era] un arcano, un misterio que hasta ahora la ciencia ha tratado en vano de aplicar. Su única solución se hallará el día que se consiga *individualizar la concepción;* esto es, precisar la persona que determinó ésta. En tanto que así no suceda, cuantas presunciones se establezcan serán no más que lo que la misma palabra indica: meras hipótesis y principios *puramente* convencionales, sobre los cuales se destacará la honradez de la mujer, exclusiva salvaguarda del honor del marido". *Op. cit.*, pág. 293.

La evaluación del pensamiento contemporáneo de vanguardia es unánimemente crítico a tal enfoque. Clama por una constante rectificación a base de atemperar la conducta y realidad humanas con la científica. Un ferviente expositor de esta vertiente, Lacruz Berdejo, la resume así: "La ley no es un (relativamente) inmutable teorema matemático, sino un mandato enunciado en un tiempo concreto, para una serie de circunstancias y dentro de un conspectus social determinados y con vigencia más o menos limitada, sobre una tabla de valores igualmente temporal y también mucho más mudable de lo que pudo pensar el legislador. Cuando cambian, o el orden de la tabla, o las circunstancias, *la ratio puede devenir incongrua, e incluso imperar solución contraria a la del texto. Y algo de eso ha venido a ocurrir en materia de investigación de la paternidad."* Prólogo a la obra de Rivero Hernández, pág. 20. (Énfasis suplido.)

## III

En las últimas dos décadas los moldes estrechos y de granito de una rigurosa literalidad hermenéutica en materia de Derecho filiatorio puertorriqueño comenzaron a quebrarse. Así, en *Pueblo* v. *Rosado*, 88 D.P.R. 456 (1963), en que el acusado reconoció voluntariamente su paternidad en el acta de nacimiento de una hija habida con una mujer casada, pero separada, cuyo marido se encontraba en los Estados Unidos decidimos que en ausencia de otra inscripción contradictoria, ese reconocimiento tenía eficacia probatoria en ley y, como consecuencia, validez para sostener una sentencia penal por abandono de menores.

*Ocasio* v. *Díaz*, 88 D.P.R. 676, 733 (1963), decisión que da plena virtualidad y validez al axioma constitucional que prohíbe todo discrimen por razón de nacimiento y proclama la igualdad y dignidad del ser humano en el área filiatoria, por vía de *dictum* en un escolio erosiona la categoría absoluta de esta presunción al criticarse la situación de cómo un "esposo, por obra y gracia de los Arts. 112 y *113* —para proteger al hijo y la fidelidad marital— sin que las células sexuales de su mujer se hubieran unido con sus gametos masculinos, se convertía en padre legítimo del hijo de otro. *Se producía una especie de partenogénesis jurídica masculina".* (Énfasis suplido.) Más importante aún, se concluyó:

> Después de entrar en vigor la Ley Núm. 229 *esa presunción de legitimidad quedó, sino debilitada, por lo menos pareada con el derecho que esa ley concede al padre* natural para que reconozca como hijo suyo al fruto de su unión adulterina, no obstante los preceptos terminantes de los Arts. 112 y 113. *La situación que a juicio nuestro se crea es la de dos personas, una considerada el padre jurídico, y la otra, el padre natural, biológico, real y verdadero, a quienes, simultáneamente, la ley concede el derecho de inscribirlo como hijo.*
>
> *Como padre de ese hijo debería prevalecer el que de ellos primeramente lo inscribió como hijo suyo en el Registro*

*Demográfico y asumió el cumplimiento de las serias y graves responsabilidades paternofiliales,* con mejor razón en una época como la presente en que para el padre jurídico es simplemente un hijo y para el natural, también simplemente, es un hijo. *Le tocaría al que no lo inscribió como hijo suyo, impugnar ante los tribunales la validez de la inscripción registral.* (Énfasis suplido.)

A tono con ese y otros análisis los pronunciamientos al respecto fueron así resumidos:

1. Todos los hijos pueden pedir que se declare judicialmente su *status* de hijos de sus padres, *con igualdad de trato jurídico;*

2. El padre —o en su defecto, sus herederos— puede reconocer de cualquier modo a sus hijos, expresa y tácitamente, *sin importar las fechas o circunstancias de sus nacimientos y para todos los efectos de ley;*

3. Ninguna declaración judicial del *status* de hijo hará pronunciamiento sobre la legitimidad o ilegitimidad del nacimiento del reclamante ni sobre el estado civil de sus padres. Al reclamante se le denominará simplemente "hijo" y a sus progenitores "padre" o "madre", según fuere el caso;

4. *Toda declaración judicial del status de hijo se fundará en la comprobación del hecho de la paternidad natural o biológica, sin importar la fecha ni demás circunstancias del nacimiento, bastando que dicha paternidad se pruebe satisfactoriamente, bajo las normas usuales de evidencia, de acuerdo con la preponderancia de las pruebas y conforme a conclusiones que tomando en consideración las circunstancias concurrentes en el caso, representen el balance más racional, justiciero y jurídico en la resolución del pleito.* No se aplicarán en cualquier acción o procedimiento filiatorio, en trámite o que se inste, las normas o requisitos de prueba señalados en el Art. 125 del Código Civil, ed. de 1930, 31 L.P.R.A. sec. 504 [.] (Énfasis suplido.) Pág. 749.

■ Si en virtud de *Ocasio v. Díaz,* la declaración *judicial* del *status* de todo hijo "se fundará en la comprobación del hecho de la paternidad natural o biológica, *sin importar la fecha ni demás circunstancias . . . bajo las*

*normas usuales de evidencia . . .*", difícilmente podemos sostener la razonabilidad, virtud y lógica de una interpretación literal con respecto a la presunción contenida en el Art. 113, segundo párrafo. Después de esa decisión, la declaración *legislativa* del *status* de un hijo no puede ampararse en una presunción categórica y restrictiva, casi absoluta, excluyente de "las normas usuales de evidencia, determinada prueba y demás circunstancias del nacimiento". Véase, E. Chiesa, *Sobre la Validez Constitucional de las Presunciones*, XIV Rev. Jur. U.I.A. 727–753 (1980). Ello con mayor razón si tomamos en cuenta que recientemente, en *Ortiz* v. *Peña*, 108 D.P.R. 458 (1979), refrendamos la confiabilidad de las pruebas serológicas para establecer la no paternidad y autorizamos expresamente a los tribunales del país para que discrecionalmente ordenaran exámenes de sangre en acciones "en la que la paternidad sea un hecho pertinente". Pág. 469.

Al presente el sistema de impugnar la paternidad incorporado en el Art. 113 no guarda correspondencia con nuestro moderno diseño constitucional. Aun en España ha sido objeto de dura crítica pues se estima que "el marco legal de la institución ha quedado tan estrecho que la violenta como una camisa de fuerza, hasta deformarla". Rivero Hernández, *op cit.*, pág. 487. El adelanto científico en materia de pruebas biológicas ha creado un abismo entre la realidad y el trasfondo ético y socio-económico en que se inspiraron épocas atrás sus autores. "Persistir luego en el error, con su secuela de injusticias y paternidades ficticias, resulta dolorosamente innecesario. . . . [Por ello] la interpretación literal es aquí tan insuficiente como inútil, amén de injusta e ilógica en sus soluciones. . . . [Se impone] en todo caso una interpretación progresiva, con función correctora, al propio tiempo que racional y sociológica . . .". Rivero Hernández, *op. cit.*, págs. 489–490.

Cuando se aprobó la versión original del artículo equivalente al 113, sus redactores circunscribieron la prueba a lo

que para ellos era la única avenida más segura. No tenían a mano el adelanto y medios biológicos científicos. Lo que antes era un misterio generacional hoy en día no lo es.

En consecuencia, opinamos que la aplicación correcta y justa del Art. 113 del Código Civil debe trascender su literalidad en abono de lograr alcanzar el verdadero espíritu que en materia filiatoria rige constitucional y legislativamente en Puerto Rico. No existe impedimento para que la prueba sobre "imposibilidad física del marido hacia su mujer" comprenda cualesquiera otras de carácter idóneo y concluyente de la imposibilidad de paternidad del marido.[1] Entre este tipo figura singularmente la evidencia científica a la cual todo tribunal deberá —en virtud de la confiabilidad o certeza que la ciencia le confiere o atribuye— darle gran peso. Regla 82 (B) de las de Evidencia de 1979.

La prueba documental y testifical que tuvo ante sí dicho foro, a base de los hechos no refutados consistentes de relaciones sexuales exclusivas entre José G. Moreno Álamo e Idys Jiménez; ausencia de relaciones entre Idys y su esposo Fernando Ayala; y reconocimiento voluntario y escrito por José Guillermo; demostró preponderantemente

---

[1] Lacruz Berdejo en el prólogo citado expone:

"En suma: si para demostrar la no paternidad la prueba se articula en el Código Civil a partir del padre, y no a partir del hijo, y, por tanto, se centra en la imposibilidad de cohabitación, y no de generación de aquel descendiente concreto, es porque esta otra clase de pruebas no existía con un mínimo de seriedad y seguridad. Mas cuando llega a existir, el juzgador, ante el mismo texto legal, no puede limitarse a hacerlo funcionar como una máquina que, siendo siempre la misma, funciona siempre igual, aunque sea en el vacío; y ha de plantearse seriamente la cuestión de la influencia de las transformaciones del entorno social y técnico sobre el significado de la ley. A partir de ese planteamiento la solución nunca podría consistir, según me parece, en rechazar, por ejemplo, las pruebas biológicas de la no paternidad so pretexto de que se hallan literalmente excluidas por el Código Civil junto con todas las demás que no consistan en la 'rupestre' imposibilidad física del marido; sino en investigar si, en el caso, tales pruebas, ofreciendo al menos igual seguridad que la única demostración expresamente permitida por el Código, respetan y fomentan al menos en idéntica medida los intereses que el legislador entendió tutelar, y cumplen las correspondientes finalidades." Págs. 23, 24.

que el padre del menor José Guillermo Moreno Jiménez fue el demandante recurrido José Guillermo Moreno Álamo. La presunción de paternidad del Art. 113 invocada fue satisfactoriamente destruida.

*Se revocará la sentencia y se dictará otra en que se declare sin lugar la demanda.*

El Juez Asociado Señor Martín concurre en el resultado sin opinión y el Juez Asociado Señor Díaz Cruz dio su conformidad y emitió voto particular.

—O—

Voto particular del Juez Asociado Señor Díaz Cruz.

A los fines de la presunción de legitimidad en el Art. 113 del Código Civil, el concepto de imposibilidad física del marido para tener acceso con su mujer, comprende e incluye la falta de fecundación, hoy científicamente demostrable, toda vez que no es el acceso carnal, y sí la fecundación, el germen determinante de la paternidad en última consecuencia. La ley tal como está redactada no podía tener otro objetivo que el acceso fertilizante, el capaz de engendrar hijos y producir confusión en la prole. La prueba para derrotar la presunción *juris tantum* de legitimidad no podrá estar conceptualmente distanciada de la liberalidad del coexistente canon 1.115, inciso 1° del Código de Derecho canónico, que Castán cita como aleccionador en apoyo de su conclusión de que "se debe extender la posibilidad de impugnación de la paternidad a aquellos casos en los que ninguna duda exista acerca de la ilegitimidad del hijo. . . . 'Pater is est quem iustae nuptiae demonstrant, *nisi evidentibus argumentis contrarium probetur*'." (Énfasis del autor.) *Derecho Civil Español, Común y Foral*, 8va ed., 1966, T. 5, Vol. 2, pág. 15.

Siempre fue el propósito de este precepto del Código Civil excluir las dudas sobre la paternidad por lo que no veo problema constitucional alguno, si el artículo es dúctil y al decidirse por la presunción rebatible en cierto modo

anticipó la apertura de la corriente contemporánea hacia la total investigación y fijación de la paternidad, propiciada por el recurso a la ciencia. *Cf. Ortiz* v. *Peña*, 108 D.P.R. 458 (1979).