PORFIRIO RAMOS SERRANO, demandante y recurrente, *v.* HÉCTOR RAFAEL MARRERO RIVERA, LA SUCESIÓN DE ANA HILDA PÉREZ compuesta por sus hijos menores de catorce años, HÉCTOR RAFAEL MARRERO PÉREZ, ANABEL MARRERO PÉREZ y CARLOS JOEL MARRERO PÉREZ, demandados y recurridos.

*Números:* R-83-384, O-83-559    *Resueltos:* 24 de abril de 1985

*Sarah Torres Peralta,* abogada del recurrente; *Delwin Vélez*

*Santiago, Alfredo Castro Mesa* y *David O. Colón O'Neill,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

En materia de filiación el Derecho puertorriqueño ha ido abriendo camino a través de la enmarañada jungla de prejuicios y convencionalismos sociales y tecnicismos de ley para hacer que brille la verdad y se reconozca a todos los fines legales la relación biológica entre padres e hijos. No solamente el hijo tiene derecho a conocer su verdadera filiación; también el padre tiene derecho a que se le reconozca su condición de tal respecto de su hijo. A eso se contrae la decisión que aquí hacemos.

I

De la demanda instada ante el Tribunal Superior, Sala de Bayamón, por el aquí recurrente, resumimos a continuación los hechos alegados:

Alrededor de dos años antes de la presentación de la demanda —fue presentada en 12 de abril de 1983— el demandante y aquí recurrente Porfirio Ramos Serrano comenzó a sostener relaciones amorosas con Ana Hilda Pérez. Aunque ella estaba casada con Héctor Rafael Marrero Rivera, en cuyo matrimonio había procreado dos hijos, se encontraba separada de su esposo. Éste a su vez vivía en público concubinato con otra mujer.

El 24 de septiembre de 1982 Ana Hilda y Héctor Rafael se divorciaron por mutuo consentimiento. Para esa fecha ella se encontraba embarazada de Porfirio, hecho que hizo saber a terceras personas y en los sitios en que recibió tratamiento para el embarazo.

El 15 de marzo de 1983 Ana Hilda dio a luz un niño. Dos semanas después, el 1 de abril, Ana Hilda falleció debido a complicaciones como consecuencia del parto.

Cinco días después, el 6 de abril, Héctor Rafael inscribió al niño como hijo suyo y de Ana Hilda. Seis días más tarde Porfirio instó demanda contra Héctor Rafael, los dos hijos habidos entre éste y Ana Hilda y el recién nacido, en que impugnó su inscripción como hijo de Héctor Rafael y solicitó se le reconozca como padre del bebé a todos los fines y se le conceda su custodia.

A instancias del demandado Héctor Rafael Marrero el tribunal de instancia desestimó la demanda. Concluyó, amparado en nuestra decisión en *Pérez* v. *Torres*, 79 D.P.R. 611, 615 (1956), y en la interpretación que allí hicimos del Art. 116 del Código Civil, 31 L.P.R.A. sec. 464, que el alegado "padre natural" no tiene "capacidad procesal para plantear la impugnación y posible pérdida del estado de legitimidad del hijo disputado", legitimidad obtenida por operación del Art. 113 del Código Civil, 31 L.P.R.A. sec. 461.(¹)

## II

En *Moreno Álamo* v. *Moreno Jiménez*, 112 D.P.R. 376 (1982) nos referimos a la presunción de legitimidad de los hijos establecida en el Art. 113 del Código Civil, 31 L.P.R.A. sec. 461, que dice:

*Art. 113*

Son hijos legítimos los nacidos después de los ciento ochenta días siguientes al de la celebración del matrimonio y antes de los trescientos días siguientes a su disolución.

Contra esta legitimidad no se admitirá otra prueba que la imposibilidad física del marido para tener acceso con su mujer en los primeros ciento veinte días de los trescientos que hubiesen precedido al nacimiento del hijo.

---

(¹)Es de justicia para con el ilustrado juez sentenciador de instancia señalar su renuencia a decidir como lo hizo, obligado por su sentido del deber de acatar nuestro pronunciamiento jurisprudencial de *Pérez* v. *Torres*, 79 D.P.R. 611 (1956). Expresó dicho juez en su sentencia que "es con no poca frustración que nos vemos obligados a resolver en contra de lo que nuestro sentido de justicia y nuestra razón nos grita ser la decisión correcta".

En el citado caso hicimos exégesis sobre el origen de esta presunción y señalamos cómo su desarrollo respondió a la imposibilidad, bajo el estado de la ciencia al tiempo de adoptarse los códigos del siglo XIX, de probar mediante prueba directa la concepción del hijo por su padre biológico. La maternidad, por el contrario, ha constituido siempre un hecho de fácil verificación puesto que el embarazo y el parto son realidades físicas externas, comprobables con relativa sencillez.

En un intento de superar la dificultad que presentaba la determinación de la paternidad, el Derecho recurrió desde tiempos antiguos al establecimiento de presunciones que le atribuían al hombre casado la paternidad de los hijos que procreara su esposa. Para precisar puntos de partida y fin en que aplicaría la presunción, los redactores del Código napoleónico establecieron, a base de los conocimientos sobre genética en aquella época, en relación con la duración del embarazo, un límite comprendido entre los ciento ochenta días siguientes a la celebración del matrimonio y antes de los trescientos días siguientes a su disolución. Presunciones de esta naturaleza y en términos similares se adoptaron en España, Alemania, Portugal, Italia y casi todos los países latinoamericanos.

Íntimamente relacionado con la presunción de paternidad se encuentra el problema de quién tiene capacidad para impugnarla. En el siglo pasado, cuando la gran mayoría de los códigos civiles europeos fueron redactados, se optó por un sistema de impugnación sumamente restringido y limitado. Como norma general sólo al marido, y en determinadas ocasiones a sus herederos, se le reconoció la facultad de llevar la acción. Al adoptarse este sistema se excluyó completamente al padre biológico, sin importar las circunstancias presentes, ni los intereses que pudiesen verse afectados. Tal es el caso del Art. 116 del nuestro Código Civil, 31 L.P.R.A. sec. 464, que dispone:

[*Art. 116.*] *Quiénes pueden impugnar la legitimidad*
La legitimidad puede ser impugnada solamente por el ma-

rido o sus legítimos herederos. Estos sólo podrán impugnar la legitimidad del hijo en los casos siguientes:

1. Si el marido hubiese fallecido antes de transcurrir el plazo señalado para deducir su acción en juicio.

2. Si muriese después de presentada la demandada sin haber desistido de ella.

3. Si el hijo nació después de la muerte del marido.

Numerosos argumentos se han esgrimido para sustentar o explicar el porqué de esta disposición. Se ha sostenido que la limitación responde a una vieja concepción de la familia en donde el marido como jefe o patriarca poseía una potestad absoluta para disponer de los asuntos que afectasen la relación familiar. También se ha entendido que la acción de impugnación implica una cuestión de honor de la que el esposo es el único juez, por lo que debe ser él quien resuelva si pone o no de manifiesto el adulterio de su mujer. Se señala que sólo el marido está en condiciones de saber si la presunción de la ley es o no fundada. Se ha indicado, además, que como el marido al valorar la conducta infiel de su esposa puede llegar a perdonarla y asumir la paternidad del hijo por ésta concebido, no debe permitirse que terceros interfieran con su decisión. Otra razón que se ha ofrecido para justificar la limitación es que se debe evitar la intromisión de terceros y de intereses extraños en una relación tan íntima como la conyugal. Se sostiene que la limitación propende a salvaguardar la paz y tranquilidad matrimonial y familiar y que tiene el efecto de proteger al hijo indefenso, conservándole su legitimidad en un número mayor de ocasiones. Sobre el particular véanse: F. Rivero Hernández, *La Presunción de Paternidad Legítima*, Madrid, Ed. Tecnos, 1971, págs. 412–413; F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1971, T. II, Vol. II, pág. 46; M. Planiol y J. Ripert, *Tratado práctico de Derecho civil francés* (M. Díaz Cruz, traductor), La Habana, Ed. Cultural, 1939, T. II, págs. 612–616; H., L. Mazeaud y J. Mazeaud, *Lecciones de Derecho*

*Civil* (L. Alcalá-Zamora, traductor), Buenos Aires, Eds. Jurídicas Europa-América, 1959, Vol. III, Parte I, págs. 332–333, 372–373; A. Colin y H. Capitant, *Curso Elemental de Derecho Civil*, 4ta ed. rev. (Traducción de la Rev. Gen. Leg. Jur.), Madrid, Ed. Reus, 1975, T. I, pág. 240; A. De la E. Martínez-Radio, *Notas acerca de la filiación ilegítima no natural*, 41 Rev. Der. Privado 361–372 (1957); C. Grossman, *Acción de impugnación de la paternidad del marido*, Buenos Aires, Ed. Ábaco, 1982, págs. 211–212; E. A. Zannoni, *Derecho de Familia*, Buenos Aires, Ed. Astrea, 1978, T. II, págs. 376–377.

A pesar de la importancia y de las serias implicaciones que para el Derecho tiene el que solamente el marido pueda impugnar una paternidad presunta, la inmensa mayoría de los autores consultados no examinan en detalle este sistema, sino que, sin ofrecer argumentos mayores, dan por sentada la limitación. [2] Rivero Hernández, sin embargo, al evaluar

---

[2] Q. M. Scaevola, *Código Civil*, 5ta ed., Madrid, Ed. Reus, 1942, T. III, págs. 288, 306–309; J. M. Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1943, T. I, págs. 545–546, 557–561; C. Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Ed. Talleres Tip. "Cuesta", 1938, T. IV, págs. 411–412; F. Sánchez Román, *Estudios de Derecho Civil*, 2da ed., Madrid, Ed. Sucrs. Rivadeneyra, 1912, T. V, Vol. II, págs. 974–981; F. Bonet Ramón, *Compendio de Derecho Civil*, Madrid, Ed. Rev. Der. Privado, 1960, T. IV, págs. 527–528, 530; J. Castán Tobeñas, *Derecho civil español común y foral*, 8va ed., Madrid, Ed. Reus, 1966, T. V, Vol. II, págs. 31–34; J. L. Lacruz Berdejo y F. A. Sancho Rebullida, *Derecho de Familia*, Barcelona, Ed. Bosch, 1966, págs. 367, 373–377; J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1970, T. IV, Vol. II, págs. 15, 37–42; D. E. Espín Cánovas, *Manual de Derecho Civil Español*, 4ta ed. rev., Madrid, Ed. Rev. Der. Privado, 1972, Vol. IV, págs. 324–325; S. Alemany Verdaguer, *Estudios sobre filiación ilegítima en el Derecho español*, Barcelona, Ed. Bosch, 1974, págs. 57–59, 68–69; L. Martínez-Calcerrada, *Discriminación de la Filiación Extramatrimonial*, Madrid, Ed. Montecorvo, 1977, pág. 360; A. Cicu, *La Filiación* (F. Giménez Arnau, traductor), Madrid, Ed. Rev. Der. Privado, 1930, pág. 114 *et seq.;* E. Kipp Wolff, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 1952, T. IV, Vol. II, págs. 8–11, 19–22; J. Carbonnier, *Derecho Civil* (M. Zorrilla Ruiz, traductor), Barcelona, Ed. Bosch, 1961, T. I, Vol. II, págs. 274–275; R. De Ruggiero, *Instituciones de Derecho Civil*, 4ta ed. (R. Serrano y J. Santa-Cruz,

el régimen de impugnación de paternidad español vigente antes de la reforma de 1981 y base del nuestro, afirma que:

[E]s el sistema de impugnación más deficiente y arbitrario de cuantos hemos visto, el más estrecho y riguroso; el más anacrónico y superado por la evolución de las ideas y realidad social y científica de nuestros días. Las concepciones biológicas y jurídicas en que se fundara son hoy práctica y absolutamente inservibles, y el marco legal de la institución ha quedado tan estrecho que la violenta como una camisa de fuerza, hasta deformarla. (3)

Señala dicho autor que un sistema de esta naturaleza pierde cualquier valor que pudiese tener al hacer posible situaciones en donde el marido, aun cuando es consciente de su no paternidad, la retiene como medio de presión, de venganza, o de chantaje contra su esposa, impidiendo así que el hijo adquiera su verdadera filiación. (4) Según Rivero al progenitor extramatrimonial se le debe dar la oportunidad de demostrar su paternidad, cuando entre los cónyuges ha habido una ruptura matrimonial y la mujer, aunque no separada legalmente de su marido vive en concubinato con el verdadero padre del niño. F. Rivero Hernández, *Los conflictos de paternidad en Derecho comparado y Derecho español*, Barcelona, Eds. Ariel, 1971, págs. 134-136.

Rivero Hernández no es el único que defiende esta posición. Cecilia Grossman también sostiene que se le debe reconocer al padre biológico la capacidad de impugnar, cuando la unión entre los cónyuges ha cesado y la vida familiar y ma-

---

traductores), Madrid, Ed. Reus, 1978, T. II, Vol. II, págs. 203-204; A. Colin y H. Capitant, *Curso Elemental de Derecho Civil*, 4ta ed. rev. (Traducción de la Rev. Gen. Leg. Jur.), Madrid, Ed. Reus, 1975, T. I, pág. 614 *et seq.*

(3) F. Rivero Hernández, *La Presunción de Paternidad Legítima*, Madrid, Ed. Tecnos, 1971, pág. 487.

(4) Rivero Hernández, *op. cit.*, págs. 413-414. Véase además "Tartaglione, *L'azione di disconoscimento di paternità e suoi limiti. Proposte di riforma legislativa*, Foro ital., 1957, IV, págs. 10-14", según citado por Rivero Hernández; *op. cit.*, pág. 414 n. 55.

trimonial se ha desintegrado por completo. Señala que el no permitir la acción en situaciones de esta naturaleza tiene el efecto directo de debilitar la institución y estabilidad de la familia, pues ante el Derecho aparece una criatura con el título de hijo legítimo del marido, cuando en realidad social otro hombre reclama la paternidad del niño y se comporta como padre, todo lo cual afecta severamente la socialización del menor. Grossman, *op. cit.*, pág. 228 *et seq.*

De Buen, por su parte, en las notas a la obra de Colin y Capitant, sostiene que aun bajo el sistema español es posible reconocerle esta capacidad al padre biológico. Señala que el derecho que la ley confiere a un padre biológico a reconocer a su hijo natural implica también el derecho a impugnar la legitimidad presunta que la criatura posee, independientemente de que la ley no lo reconozca. Colin y Capitant, *op. cit.*, pág. 630.

El énfasis moderno en el descubrimiento de la verdad biológica, así como el reconocimiento de que en la determinación de las relaciones paterno-filiales confluyen, junto al interés del marido, los intereses del hijo, los de la madre y los del padre biológico, ha traído como consecuencia la erosión de la norma de que sólo el marido, mientras viva, puede impugnar su paternidad.

En España, luego de la reforma de 1981, el Código Civil en sus Arts. 136 y 137 concede la acción de impugnación al esposo, a sus herederos y al hijo. La madre, cuando ejerza la patria potestad y el Ministerio Fiscal, cuando así lo requieran los intereses del menor o incapacitado, también quedarán autorizados a instar la acción.

De un examen cuidadoso a la reforma española se desprende que no son los mencionados las únicas personas que pueden promover una acción de impugnación. Al eliminar la distinción entre hijos adulterinos y naturales y permitir al padre biológico reconocer a sus hijos extramatrimoniales, implícitamente se autorizó a éste a impugnar cualquier filiación

contradictoria que obstaculizara el reconocimiento. Esto es consecuencia de lo dispuesto en el Art. 113 al efecto de que no será eficaz la determinación de una filiación en tanto resulte acreditada otra contradictoria. Véanse: J. L. Lacruz Berdejo, F. A. Sancho Rebullida, A. Luna Serrano, J. Delgado Echevarría y F. Rivero Hernández, *El nuevo régimen de la familia*, Madrid, Ed. Civitas, 1982, T. II, pág. 65; y J. Santos Briz, *Derecho Civil*, Madrid, Ed. Rev. Der. Privado, 1982, T. V, págs. 333–334.

En Francia luego de las enmiendas de 1972, el Código Civil en su Art. 312 mantiene la acción de impugnación como exclusiva del marido. Sin embargo, esta exclusividad no es tan absoluta como aparenta al examinarse en conjunción a otras disposiciones del Código. Por ejemplo, el Art. 318 concede a la madre el derecho a impugnar la paternidad de un cónyuge, a los fines de obtener la legitimación del hijo cuando después de la disolución del matrimonio decide contraer nupcias con el verdadero padre de la criatura. Así también, se ha permitido jurisprudencialmente que un tercero interesado como presunto padre biológico, pueda discutir la paternidad marital cuando el niño, a pesar de ostentar el título de legítimo, no goza de la posesión de estado frente al marido de la madre. En estos casos el tercero tendrá la facultad de reconocer al menor, a promover una acción de reclamación de paternidad extramatrimonial. Esta acción se fundamenta en los Arts. 311–312 que disponen que los tribunales regularán los conflictos de filiación para los cuales la ley no ha fijado otro principio, en función de la filiación más verosímil, y en defecto de elementos suficientes de convicción, tendrán en cuenta la posesión de estado del hijo. Véase al efecto la S. de la Corte de Casación del 9 de junio de 1976 (1er Ch. Civ.), 1976 Recueil Dalloz Sirey 593.

En Alemania tanto el marido (Art. 1594 del Código Civil) como el hijo (Art. 1596) pueden impugnar el estado de filiación legítima. El hijo puede hacerlo en los siguientes casos:

1) En el supuesto de fallecimiento o declaración de ausencia con presunción de fallecimiento del marido, si éste no ha perdido su derecho a desconocer la paternidad por el transcurso del tiempo;

2) En caso de divorcio o nulidad de matrimonio o si los esposos, desde hace tres años, viven separados y no cabe esperar la reanudación de la vida en común;

3) Si la madre ha contraído matrimonio con el hombre que ha engendrado al hijo;

4) Cuando la impugnación se justifica moralmente por la vida deshonrosa o infamante del marido o por una falta grave contra el hijo;

5) Cuando la impugnación se halla moralmente justificada a causa de una grave enfermedad hereditaria del marido.

En Costa Rica el Art. 72 del Código de Familia de 1974 mantiene en el marido, mientras viva, la facultad exclusiva de impugnar la paternidad. Los Arts. 90 y 99 impiden todo intento de reconocimiento de un hijo extramatrimonial cuando éste ostenta el título de legítimo y la posesión de estado correspondiente. Sin embargo, el Art. 71 considera como extramatrimonial al hijo nacido después de los trescientos días de la separación de *hecho* de los cónyuges, que no hubiere tenido posesión notoria de estado por parte del marido. En estas circunstancias será posible que el padre biológico inicie una acción para reconocer al hijo como propio. Si el marido se opusiere, el Art. 84 dispone que el conflicto se ventilará por la vía ordinaria, lo que implica que el padre verdadero también podrá discutir la paternidad del esposo. Así también el Código de Familia cubano de 1975 permite en su Art. 81 que el padre biológico entable una acción para inscribir como hijo suyo a la criatura previamente reconocida por otra persona.

En Puerto Rico, hasta 1954 sólo podían impugnar la presunción de legitimidad fijada por el Art. 113 el marido, y los herederos, en limitadas circunstancias. Ese año resolvimos en

*Agosto* v. *Javierre*, 77 D.P.R. 471 (1954) que el Art. 116, que sólo permitía la impugnación por el padre y los herederos, quedó enmendado implícitamente por la Ley Núm. 229 de 12 de mayo de 1942. (⁵) Reconocimos en esa ocasión que un hijo de madre casada procreado en relaciones extramatrimoniales podía llevar una acción filiatoria al amparo de la Ley Núm. 229, aun cuando tal acción implicase la impugnación de la presunción de legitimidad.

Dos años más tarde tuvo oportunidad este Tribunal de interpretar nuevamente el alcance de la citada Ley Núm. 229 frente a una situación fáctica como la que ahora consideramos. (⁶) No obstante, resolvió este Tribunal, amparado en el Art. 116 del Código Civil, que el demandante que alegaba ser el padre biológico de una menor nacida a una mujer que estaba casada con otro hombre al tiempo de su concepción y nacimiento, por ser reputada hija legítima del esposo de su ma-

---

(⁵) La Ley Núm. 229, en lo aquí pertinente, dispone:

"Sección 1.—Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta Ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

"Sección 2.—Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior, podrán ser reconocidos por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, a todos los efectos legales. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

.     .     .     .     .     .     .     .

"Sección 4.—Toda ley o parte de ley que se oponga a la presente, queda por ésta derogada."

(⁶) El demandante Felipe Pérez declaró que para la fecha de la concepción, del embarazo y el nacimiento de la menor Rada Torres Rosado, vivía en público concubinato con la madre de ésta en Peñuelas; que para esa fecha Jova Rosado, madre de la menor, estaba casada con Bartolo Torres pero "nunca vivió con él desde que se casó", que siempre se ha ocupado de la educación y alimentación de la niña y la ha tratado en igual forma que a sus hijos legítimos; y que tanto él como la madre y la menor (que a la sazón tenía 17 años de edad) deseaban que se inscribiera en el Registro Demográfico como hija natural reconocida de Felipe Pérez y Jova Rosado. *Pérez* v. *Torres*, 79 D.P.R. 611, 614 (1956).

dre, no tenía facultad ni acción alguna para impugnar la legitimidad de la niña. *Pérez* v. *Torres*, 79 D.P.R. 611, 615 (1956). Ceñidos a la letra del citado Art. 116 señalamos en *Pérez* v. *Torres*, supra, pág. 615, que la demanda en dicho caso no aducía causa de acción, "pues el estado personal de hijo legítimo se sustenta mientras no sea destruído *a instancia de las personas que por ley pueden impugnar la legitimidad*". (Énfasis en el original.)

A pesar de esta decisión, en *Pueblo* v. *Rosado*, 88 D.P.R. 456 (1963), reconocimos plena eficacia al reconocimiento voluntario por un padre biológico de la hija que éste procreó con una mujer casada en ausencia de inscripción contradictoria, a los fines de una acción penal por abandono de menores.

Y ese mismo año en *Ocasio* v. *Díaz*, 88 D.P.R. 676 (1963), en un *dictum*, —escolio 10, pág. 733— nos referimos a la situación particular que presentaban los padres biológicos de niños procreados en mujeres casadas, y expresamos lo siguiente:

> También, como secuela de la Ley Núm. 229, se creó una peculiar situación respecto a las declaraciones categóricas de los Arts. 112 y 113 de nuestro Código Civil al efecto de que son hijos legítimos los nacidos después de la celebración del matrimonio y los nacidos antes de los trescientos días siguientes a su disolución. Hasta el 10 de agosto de 1952, cuando nacía un hijo de mujer casada y hombre soltero, la barrera del adulterio le impedía al padre natural reconocerlo ante el derecho. Claro que nada impedía, que el padre, como cuestión de hecho, aceptara que procreó un hijo adulterino. El esposo, por obra y gracia de los Arts. 112 y 113 —para proteger al hijo y la fidelidad marital— sin que las células sexuales de su mujer se hubieran unido con sus gametos masculinos, se convertía en padre legítimo del hijo de otro. Se producía una especie de partenogénesis jurídica masculina.
>
> Después de entrar en vigor la Ley Núm. 229 esa presunción de legitimidad quedó, sino debilitada, por lo menos pareada con el derecho que esa ley concede al padre natural

para que reconozca como hijo suyo al fruto de su unión adulterina, no obstante los preceptos terminantes de los Arts. 112 y 113. La situación que a juicio nuestro se crea es la de dos personas, una considerada el padre jurídico, y la otra, el padre natural, biológico, real y verdadero, a quienes, simultáneamente, la ley concede el derecho de inscribirlo como hijo.

Como padre de ese hijo debería prevalecer el que de ellos primeramente lo inscribió como hijo suyo en el Registro Demográfico y asumió el cumplimiento de las serias y graves responsabilidades paterno-filiales, con mejor razón en una época como la presente en que para el padre jurídico es simplemente un hijo y para el natural, también simplemente, es un hijo. Le tocaría al que no lo inscribió como hijo suyo, impugnar ante los tribunales la validez de la inscripción registral.

Algunas de las expresiones nuestras en ese *dictum* han sido criticadas desfavorablemente. Véanse: A. Calderón, *La Filiación en Puerto Rico*, 2da ed., San Juan, Ed. Col. Abogados, 1978, pág. 152 y ss.; y A. Blanco, *Sobre Reforma del Código Civil*, 43 Rev. Jur. U.P.R. 103, 127–132 (1974). Consideran estos autores que la paternidad no puede depender en estos casos de quién inscriba primero. Calderón señala que la teoría descansa en la premisa de que si un hombre desea reconocer al hijo de una mujer casada, es porque indudablemente es su hijo biológico, y que ello no es necesariamente así. No obstante, ambos autores coinciden en que el procedimiento a seguir debe ser que el padre biológico impugne primero la presunción de paternidad que la ley le otorga al marido.

### III

Frente a los hechos alegados en la demanda de que aquí nos ocupamos, que tienen que tomarse como ciertos a los fines de disponer de la moción de desestimación, *First Fed. Savs.* v. *Asoc. de Condómines*, 114 D.P.R. 426 (1983), se impone como solución justa, cónsona con la realidad y en armonía con las modernas tendencias del Derecho en materia

de filiación, reconocer la facultad del alegado padre biológico a impugnar la paternidad que ostenta, con carácter de legítima, el demandado Héctor Rafael Marrero.

■ El escollo que halló el tribunal de instancia para resolver distinto, es decir, nuestra decisión en *Pérez* v. *Torres*, supra, tiene que eliminarse. Si en *Agosto* v. *Javierre*, supra, reconocimos facultad al hijo, reputado legítimo en obediencia al Art. 113, para impugnar dicha legitimidad no obstante los términos del Art. 116, por los mismos razonamientos tenemos que reconocer facultad al padre biológico para impugnar la legitimidad que se basa, no en una realidad y sí en una presunción de ley. *Moreno Álamo* v. *Moreno Jiménez*, supra.

La citada Ley Núm. 229 *declara* en su sección primera que "serán hijos naturales todos los hijos nacidos fuera de matrimonio . . . independientemente de que sus padres hubieran podido o no contraer matrimonio al tiempo de la concepción de dichos hijos". El niño que se procreó en el vientre de Ana Hilda fue concebido estando aún vigente su matrimonio con el demandado Marrero pero fuera de ese matrimonio, pues no nació de él y sí de la relación extramatrimonial entre Ana Hilda y el demandante Ramos. La circunstancia de que ella estuviera casada con Marrero al ser concebido el niño —no lo estaba cuando éste nació pues se habían divorciado— dio vigencia a la presunción de que es hijo legítimo de Marrero.

■ Antes de aprobarse la Ley Núm. 229 dicha presunción no podía ser atacada ni por el niño ni por el padre biológico, por prohibirlo el Art. 116 del Código Civil. No puede sostenerse que la Ley Núm. 229 varió dicha disposición en cuanto al hijo pero no en cuanto al padre. Dicha ley es de carácter sustantivo por cuanto declara el estado de los hijos a todos los fines, y es enmendatoria del Art. 116 del Código Civil, según reconocimos en *Agosto* v. *Javierre*, supra. La condición de hijo está en relación directa con la de padre. De ello se colige que si el hijo tiene derecho bajo la Ley Núm. 229 a

probar su filiación natural mediante la impugnación de la presunta filiación legítima, también el padre tiene derecho, para probar su paternidad natural y biológica, a impugnar la presunción de que su hijo es hijo legítimo de otro. Véanse las citas de De Buen, La Cruz Berdejo, Sancho Rebullida, Luna Serrano, Delgado Echevarría, Rivero Hernández, Santos Briz, *op. cit.*, quienes reconocen que el derecho de un padre biológico a reconocer a su hijo natural implica también su derecho a impugnar la legitimidad presunta del hijo, independientemente de que la ley no lo reconozca. Nuestra decisión en *Pérez* v. *Torres* debe, por tanto, considerarse revocada.

Vienen al caso y cobran actualidad, las siguientes atinadas expresiones del Juez Negrón Fernández en su opinión concurrente en *Agosto* v. *Javierre*, supra, pág. 475:

> Las trabas que el legislador quiso deshacer con la aprobación de la Ley 229 no deben producir más frustraciones de derechos filiatorios, ni por efectos del art. 116 del Código Civil en cuanto a hijos nacidos del adulterio de mujeres casadas, ni por efectos del art. 125 en cuanto a esos y todos los demás hijos naturales nacidos bajo la vigencia de dicha ley. El propósito reparador de esa pieza legislativa requiere que sus disposiciones se apliquen teniendo como fondo el realismo intrínseco del derecho, y así, por virtud de la inherente verdad que encierran, presenciar, en plena comunión de sus valores mutuos "el triunfo del sentido humano de la ley" y la eminente función social de la justicia. (Escolio omitido.)

La decisión a que aquí llegamos asegura una vez más "el triunfo del sentido humano de la ley" a que aludió el Juez Negrón Fernández al adoptar esta frase del Juez Texidor y Alcalá del Olmo.[7] Aparte de ser cónsona con el espíritu de esencial justicia que animó al legislador a aprobar la Ley Núm. 229 de 12 de mayo de 1942, esta solución se impone con más fuerza ante los hechos alegados en este caso. Los argumentos tradicionales propuestos para justificar la tesis de

---

[7]*Stella Vda. de Ortiz* v. *Corte*, 41 D.P.R. 635, 641, 643 (1930).

que solamente el marido y sus herederos pueden impugnar la legitimidad son aquí inexistentes. Al tiempo de la concepción del niño no había relación matrimonial que proteger, pues tanto Ana Hilda como Marrero vivían en público concubinato con otras personas. Cuando nació el niño ya se habían divorciado. El niño nació y vive bajo la posesión de estado de hijo del demandante Ramos. Aparte del derecho del niño a que se reconozca su verdadera filiación, no podemos pasar por alto el derecho del padre biológico a que también se le reconozca su condición de tal.

## IV

■ Por los razonamientos expresados, *se revocará la sentencia recurrida y se devolverá el caso al tribunal sentenciador para ulteriores procedimientos compatibles con lo aquí expresado. En vista del posible conflicto entre los intereses del menor y los del demandado Héctor Rafael Marrero Rivera, el tribunal a quo deberá nombrar un defensor judicial para que represente al primero.* Robles López v. Guevárez Santos, *109 D.P.R. 563, 568 (1980); Agosto v. Javierre, supra, pág. 500.*